IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | Criminal No. RDB-19-0600 |
| | * |
| JOSEPH EDWARD LIBERTO, | |
| | * |
| Defendant. | |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

On December 18, 2019, the Grand Jury returned a thirty-one-count Indictment (the "Indictment") charging the Defendant Joseph Edward Liberto ("Liberto" or "Defendant"), former co-owner of Sierra Construction, LLC ("Sierra"), with one count of wire fraud conspiracy under 18 U.S.C. § 1349 and thirty counts of wire fraud under 18 U.S.C. § 1343. (ECF No. 1.)  Each count stems from an alleged wire fraud scheme whereby Liberto allegedly defrauded the United States Postal Service ("USPS") out of more than $2 million by causing Sierra to hide from EMCOR Facilities Services, Inc. ("EMCOR"), an agent for the USPS with which Sierra contracted, its use of subcontractors so that it could submit invoices that far exceeded the amount actually paid to them.

Pending now are the Defendant's Motion to Strike as Surplusage the Allegation that the Alleged Scheme Sought to "Defraud EMCOR" (ECF No. 20) and Defendant's Motion to Dismiss Counts 5-8, 11-12, 14-15, 23, 25, 27-29 and 31 of the Indictment (ECF No. 21).  After reviewing the parties' submissions, this Court conducted a hearing on October 5, 2020.  The Defendant's arguments are without merit, as the allegation that EMCOR was defrauded within the meaning of the wire fraud statute is not irrelevant to the charge and is not inflammatory

or unfairly prejudicial. Further, the question as to whether the Defendant was required to submit contractor details for every invoice is one for the jury. For the reasons set forth below, Defendant's Motion to Strike as Surplusage the Allegation that the Alleged Scheme Sought to "Defraud EMCOR" (ECF No. 20) is DENIED, and Defendant's Motion to Dismiss Counts 5-8, 11-12, 14-15, 23, 25, 27-29 and 31 of the Indictment (ECF No. 21) is also DENIED.

## BACKGROUND

The Defendant is charged in a thiry-one-count Indictment that was returned by the Grand Jury on December 18, 2019. (ECF No. 1.) These 31 Counts stem from an alleged wire fraud scheme whereby Liberto allegedly defrauded USPS out of more than $2 million by causing his former company, Sierra, to hide from EMCOR, an agent for the USPS with which Sierra contracted, its use of subcontractors so that it could submit invoices that far exceeded the amount it paid to them.

Beginning in November 2010, Sierra entered a series of contracts, known as "supplier agreements," with EMCOR, whereby Sierra agreed to perform repair work on USPS facilities subject to certain terms, conditions, and requirements. (Indictment ¶ 6.) As the President of Sierra, Liberto was responsible for the oversight and management of the work EMCOR assigned to Sierra for the USPS. (*Id.* ¶ 5.) EMCOR was the "agent or clearing house responsible for receiving service calls for needed repair work or alterations on its customers' [i.e. USPS] facilities and then assigning those to service providers [i.e. Sierra]; reviewing and approving proposals submitted by [Sierra] for performing the requested work; monitoring [Sierra's] performance of the work; and then receiving the final invoice from [Sierra] and processing it for payment." (*Id.* ¶ 2.) EMCOR had entered into a contractual relationship

2

with the USPS in 2006 whereby it agreed to act as USPS' agent for the performance of the above listed functions. (*Id.*)

The supplier agreements between EMCOR and Sierra specified, *inter alia*, the labor rates to be paid by EMCOR and USPS for certain labor classifications (i.e. General Foreman, Foreman, Tradesman, Apprentice, Laborers) or trade/service classifications (i.e. HVAC, electrical, overhead doors, lighting, lock & key, plumbing, signs and flags); maximum allowable mark-ups for materials (20%) and equipment rental (20%); allowable amounts that would be paid for trip charges to analyze the repair of maintenance issues identified in work orders and to perform necessary repairs; and the time period within which Sierra had to respond and complete needed repairs, based upon the priority level assigned by EMCOR (from highest/most urgent level P5 to lowest/least urgent level P1). (*Id.* ¶ 6.)

During the course of this contractual relationship, Sierra and EMCOR periodically executed new contracts, or "updated Supplier Agreements," in April 2012, April 2013, January 2016, and June 2018. (*Id.* ¶ 7.) Starting with the April 2013 updated Supplier Agreement, every subsequent contract included provisions relating to the use of subcontractors by Sierra on repair contracts assigned to it by EMCOR, such as the following:

> If the work is subcontracted (USPS only), subcontractor's invoice(s) must be attached to provider's invoice. A copy of the fully itemized invoice that shows labor rates, labor hours, total workers on location, itemized materials, and a full description of the work. If this is not provided, the invoice will be rejected back until ECMOR secures this information. A subcontractor's quote cannot be used as an invoice. Support must be an actual invoice provided by subcontractor. USPS only allows specific mark-ups on subcontractor invoices. The format is as follows:
> - $0 - $500 - $50 flat markup
> - $501 - $1000 - $100 flat markup
> - Above $1000 – 10% markup

3

(*Id.* ¶ 8.)   The April 2013 updated Supplier Agreement limited mark-ups on materials and rented equipment to Cost + 20%, and provided that trip charges were to be billed at $75 per trip if within a radius of 25-50 miles from Sierra's location; $100 if 50-75 miles; and $125 if 75-100 miles.  (*Id.* ¶ 9.)  Of the 21 categories of construction and repair services listed, Sierra stated that it would provide all but 2 of the indicated services, when it instead allegedly relied upon subcontractors to perform those services.  (*Id.* ¶¶ 10-11.)

In January of 2016, EMCOR and Sierra (by Liberto's signature) executed a new and more detailed Supplier Agreement, providing:

> If the work is subcontracted (USPS only) by Supplier, Supplier's invoice must include the subcontractor's invoice that shows labor rates, labor hours, total workers on location, itemized materials, and a full description of the work.  If this is not provided, the invoice will be rejected until such information is delivered. A subcontractor's quote cannot be used as an invoice.  Support must be an actual invoice provided by subcontractor.  USPS only allows specific mark-ups on subcontractor invoices found in Performance Standards Attachment.

(*Id.* ¶ 13.) The January 2016 Supplier Agreement included the same 20% mark-up on materials and equipment rentals and same allowable trip charges as the April 2013 Supplier Agreement. (*Id.* ¶ 15.)  In response to a question "Will you self-perform or subcontract in this area?," Sierra responded "self-perform."  (*Id.* ¶ 16.)  It also provided that mark-ups for subcontractor efforts invoicing shall be no more than $50 markup for $0 to $500 and no more than 10% markup for $501 to $15,000.  (*Id.* ¶ 18.)  Finally, it also provided that all external service providers (including Sierra) must submit invoices electronically to be reviewed by EMCOR personnel. (*Id.* ¶ 19.)

In June of 2018, Sierra and EMCOR executed another new Supplier Agreement, with much of the same provisions relating to subcontractor's invoices.  (*Id.* ¶¶ 22-26.)  Both the

January 2016 and June 2018 Supplier Agreements contained an "Addendum" that distinguishes between two different type of project proposals: a firm-fixed price proposal ("FFP proposal") and a not-to-exceed proposal ("NTE proposal"). (*See* ECF No. 21-2 at 13-15; ECF No. 21-3 at 15-17.) The Addendum defines a FFP proposal as: "a proposal that is all-inclusive with respect [to] the labor, materials and all other costs required by the customer to accomplish the scope of work," and "when submitting invoices associated with firm-fixed proposals, …[suppliers] are not required to furnish a breakdown of costs at the time of invoice submission, but shall include a copy of the original proposal that was approved by the customer which includes the breakdown of costs." (*Id.*) An NTE proposal is defined as: a "proposal with an upper-limit, and as accurate as is practical, estimate of what is required to accomplish the work," and such work "may include work performed by Supplier and/or their subcontractors" and when submitting invoices associated with NTE proposals, the Supplier "shall furnish a breakdown of actual incurred costs at the time of invoice submission."

> The Addendum further provides:
>
> All work order proposals between $2,000 and $10,000 shall be identified and presented as being *EITHER* Firm-fixed Price *OR* as Not To Exceed, with each being documented per the definitions set forth below.  All work order proposals, and multiples thereof, that exceed $10,000 shall be considered Firm-fixed Price, and shall be documented per the definitions outlined…."

(*Id.*) Invoices for $2,000 to $25,000 "shall contain a copy of the original quote approved by the USPS Facilities Project Manager, receipts for rental equipment, and photos to the extent such photos can accurately represent the work executed." (*Id.*) Finally, the Addendum provides, that "[m]arkups on work subcontracted by Supplier shall be allowed in accordance with the following: the Postal Service will allow and pay for one (1) tier of subcontractor

5

markup, and in all cases, any markup by Supplier on subcontracted work shall be clearly identified on the initial cost proposal." (*Id.*)

From April 2013 through December 31, 2018, Sierra transmitted the proposals it prepared in response to work orders issued to it by EMCOR, and the final invoices thereto, via email from its offices in Maryland to EMCOR's offices in Phoenix, Arizona and Norristown, Pennsylvania. (*Id.* ¶ 27.)

Count One alleges:

Joseph Liberto, together with other co-schemers known and unknown to the members of the Grand Jury, did knowingly devise and intend to devise a scheme and artifice to defraud EMCOR and the Postal Service as to material matters, and to obtain and attempt to obtain by means of materially false and fraudulent pretenses and representations, money and property of the Postal Service, in an amount in excess of $2 million, more or less . . . .

(*Id.* ¶ 28.) As part of this scheme to defraud, the Indictment alleges that the Defendant fraudulently misrepresented Sierra's repair capabilities, or its intent to self-perform projects involving, *inter alia*, HVAC, glass repair, fencing, door repair, electrical work, plumbing work, repair and replacement of locks, and paving jobs. (*Id.* ¶ 31.) The Indictment further alleges that the Defendant did not disclose Sierra's use of subcontractors on the proposals and invoices that it submitted to EMCOR and did not provide the estimates or invoices that Sierra had received from the subcontractors it hired to perform the assigned repair services. Liberto allegedly instructed and caused other Sierra employees to instruct subcontractors that they should not leave copies of their proposals, estimates, or invoices with USPS employees at the facilities where they performed their repair work and that they should not transmit any such proposals, estimates, or invoices to the employees at EMCOR or USPS. (*Id.* ¶ 31.) The Defendant also allegedly instructed Sierra's project managers to submit fraudulent equipment

6

receipts reflecting that Sierra had rented large pieces of equipment (e.g., bucket trucks or lifts) to perform the EMCOR assigned projects, when in reality, Sierra had allegedly hired subcontractors who possessed the necessary equipment and did not bill it separately, instead billing only for the time of the technicians responsible for operating the equipment.  (*Id.* ¶ 31.) Finally, the Government alleges that the Defendant falsely added trip fees to proposals and invoices regarding repair projects, and instructed Sierra's project managers to do the same on projects where no Sierra employees actually traveled to the USPS facility in connection with the assigned repair work.  (*Id.* ¶ 31.)

In Counts Two through Thiry-One, the Indictment alleges wire fraud and, in doing so, reallages and incorporates by reference Count I.  Counts Two through Thirty-One each correspond to a specific date and wire transaction as itemized in the Indictment. (ECF No. 1 at 15-22.)

## ANALYSIS

**I.       Motion to Strike (ECF No. 20)**

Rule 7(d) of the Federal Rules of Criminal Procedure grants discretion to the trial court to "strike surplusage from the indictment."  Courts should grant motions to strike surplusage "only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial."  *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006) (quoting *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998)).  A court can avoid potential prejudice by not giving the indictment to the jury and specifically instructing the jury that the indictment is not evidence.  *Williams*, 445 F.3d at 734.

Defendant moves to strike as surplusage the allegation in paragraph 28 of the Indictment that provides he defrauded EMCOR, in addition to USPS.  Paragraph 28 of Count One of the Indictment provides:

> Joseph Liberto, together with other co-schemers known and unknown to the members of the Grand Jury, did knowingly devise and intend to devise a scheme and artifice *to defraud EMCOR and the Postal Service* as to material matters, and to obtain and attempt to obtain by means of materially false and fraudulent pretenses and representations, money and property of the Postal Service, in an amount in excess of $2 million, more or less . . . .

(ECF No. 1 (emphasis added).)  The dispute here is over the words "to defraud EMCOR and USPS."  Specifically, the Defendant argues that to include the words "EMCOR and" in the Indictment suggests that the Defendant pursued a scheme to defraud EMCOR itself.  The Defendant claims that such an allegation is a misstatement of law, and therefore, irrelevant and prejudicial to the Defendant.

The Defendant argues that because EMCOR was no more than a conduit and neither suffered nor was intended to suffer property loss, it cannot have been "defrauded" for purposes of the wire fraud statute.  Substantive wire fraud counts must allege: (1) a "scheme or artifice to defraud, or for obtaining money or property by means of false pretenses"; and (2) that a "wire, radio, or television communication" was used in furtherance of the scheme. 18 U.S.C. § 1343; *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012) *as amended* (Mar. 29, 2012).  In *McNally v. United States*, 483 U.S. 350, 351 (1987) the Supreme Court held that mail fraud is "limited in scope to the protection of property rights," and in *Skilling v. United States*, 561 U.S. 358, 400, 409 (2010) and *Cleveland v. United States*, 531 U.S. 12, 15 (2000), the Court applied *McNally* to wire fraud.  The Fourth Circuit and this Court have therefore held that "the victim of the alleged fraud [must] actually have an interest in the money or property

8

obtained by the defendant." *United States v. Gray*, 405 F.3d 227, 234 (4th Cir. 2005); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1073 (D. Md. 1991).  The Supreme Court instructs that this requirement should be "interpreted broadly." *McNally*, 438 U.S. at 356; *see also United States v. Mancuso*, 42 F.3d 836, 845 (4th Cir. 1994).

The Defendant claims that EMCOR had no such property interest in the money obtained by the Defendant and, therefore, cannot have been defrauded as a matter of law. Starting in or around 2006, EMCOR entered a contractual relationship with USPS whereby it agreed to act as its agent or "clearing house." (Indictment ¶ 2.)  As USPS's agent, EMCOR was responsible for receiving service calls for needed repair work or alteration on its customers' facilities and then assigning those to service providers (SPs); reviewing and approving proposals submitted by the SPs for performing the requested work; monitoring the SP's performance of the work; and then receiving the final invoice from the SP and processing it for payment. (*Id.*)  EMCOR assigned work orders for USPS facility repair jobs to Sierra and others and was responsible for "monitoring timely performance of the repairs; and approving proposals and paying invoices received from companies it hired to perform repair work." (*Id.* ¶ 3.)  EMCOR was therefore responsible for paying Sierra's invoices.  USPS, as the general contractor for the work, paid EMCOR the necessary funds to cover the invoices paid by EMCOR.  The contract between EMCOR and USPS provided that EMCOR would not pay SP invoices from its own funds.  (*See* ECF No. 21-4 ("Under no circumstances shall the EMCOR Customer Solutions Center be responsible for providing payment to you out of its own funds.").)  The Defendant argues that because funds merely passed through EMCOR

9

from USPS to Sierra, EMCOR lacked any recognizable property interest in the funds. Without such interest, EMCOR could not have been deprived of money or property by the Defendant.

The Government argues that the Defendant's "pass-through" argument is misconceived and irrelevant in light of the Supreme Court's decision in *Shaw v. United States*, 137 S. Ct. 462 (2016). The Government claims that EMCOR was in fact defrauded because EMCOR, as an agent, had a property right to funds entrusted to it by USPS, its principal. In *Shaw*, the defendant was convicted of defrauding a financial institution by unlawfully accessing and transferring funds from a victim's bank account to his own bank account. 137 S. Ct. at 466. The defendant argued that although he defrauded the victim account holder, he did not defraud the bank. The fraudulent scheme was designed "to obtain only a bank *customer's* property, not a bank's *own* property." *Id.* (internal quotations and citations omitted). The Court rejected this argument, finding that a bank does have a property interest in the funds deposited by its customers. *Id.* This is true even where the "contract between the customer and the bank provides that the customer retains ownership of the funds and the bank merely assumes possession" and acts as a "bailee." *Id.* With the creation of a bailment relationship, a bailee gains "the right to possess the deposited funds against all the world but for the bailor." *Id.* (citing 8A Am. Jur. 2d, Bailment § 166, pp. 685-86 (2009)).

Given the Supreme Court's holding in *Shaw* and its directive that the required property interest for mail and wire fraud be "interpreted broadly" in *McNally*, 438 U.S. at 356, it seems that a bailee's interest in property, like that of EMCOR, is an interest in money or property that can give rise to a claim of mail or wire fraud. In this case, EMCOR's position is analogous to that of a bank as provided in *Shaw*. In holding USPS's funds for payment of Sierra's

10

invoices, EMCOR was an agent and bailee of USPS with a property right to possess the funds, good against all the world except USPS. The Indictment does not misstate the law in alleging that the Defendant intended to devise a scheme and artifice to defraud EMCOR as well as USPS. Accordingly, the words "EMCOR and" cannot be characterized as "not relevant to the charge."

Even if this Court were to find that the Indictment misstates the law in alleging that EMCOR, as well as USPS, was defrauded and that such statement is "not relevant to the charge," the Defendant must also clearly show that the allegation is inflammatory and unfairly prejudicial. *See Williams*, 445 F.3d 724, 733 (4th Cir. 2006). The Defendant argues that if the Indictment alleges that EMCOR was "defrauded," jurors might speculate about what acts constitute the charged crimes and, according to the Defendant, might incorrectly assume that either (1) defrauding EMCOR is equivalent to defrauding the USPS; or (2) deprivation of a property interest is not necessary for a wire fraud charge.

This argument is unpersuasive. The Defendant has not shown how the allegation would be inflammatory or prejudicial, particularly when the Court can instruct the jury that the Indictment is not evidence. In *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986), the Fourth Circuit confirmed that "[t]he submission of an indictment to the jury is a discretionary matter with the district court." Further, it found that even if irrelevant allegations that should have been redacted were submitted to the jury, there was no reversible error where the judge instructed the jury that the indictment was not evidence. *Id.* The inclusion of "EMCOR and" does not create prejudice or a risk of misleading the jury, as the Court's instructions can clearly remedy any such concen. The standard for striking surplusage is

11

exacting. *See United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006); *United States v. Jordan*, 626 F.2d 928, 930 n. 1 (D.C. Cir. 1980). This case does not meet such standard.

Accordingly, Defendant's Motion to Strike as Surplusage the Allegation that the Alleged Scheme Sought to "Defraud EMCOR" (ECF No. 20) is DENIED.

## II. Motion to Dismiss (ECF No. 21)

Defendant also seeks to dismiss Counts 5-8, 11-12, 14-15, 23, 25, 27-29, and 31 of the Indictment for failure to state an offense.

### A. Standard of Review

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment "be a plain, concise and definite written statement of the essential facts constituting the offense charged." Under Rule 12(b)(3)(B)(v), a Defendant may file a motion to dismiss challenging an indictment for failure to state an offense.

The Fourth Circuit has recognized that "[i]n order to be legally sufficient, '[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense.'" *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997) (quoting *United States v. Daniels*, 973 F.2d 272, 274 (4th Cir. 1992)); *see also United States v. Palin*, 874 F.3d 418, 424 (4th Cir. 2017); *United States v. Hooker*, 841 F.2d 1225, 1231 (4th Cir. 1988).

When the language of the statute is used in the general description of an offense, "it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-118 (1974) (quoting *United States v. Hess*,

12

124 U.S. 483, 487 (1888)). Specific facts need not accompany statutory language, however, when the language at issue presents a "question of law" and the term is "sufficiently definite in legal meaning to give a defendant notice of the charge against him." *Hamlin*, 418 U.S. at 118-119. Where the defendant has adequate notice of the nature of the charges, the Fourth Circuit has consistently upheld as sufficient indictments that did not allege specific acts in violation of cited statutes. *See, e.g.*, *United States v. Amend*, 791 F.2d 1120, 1125 (4th Cir. 1986).

In reviewing a motion to dismiss an indictment for failure to state an offense, a district court must accept all factual allegations in the indictment as true. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952). The Court should regard the indictment in a "practical," rather than "purely technical," manner. *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994); *see United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring) ("It is elementary that a motion to dismiss [a count of the] indictment implicates only the legal sufficiency of its allegations, not the proof offered by the Government.").

### B. Discussion

Counts 5-8, 11-12, 14-15, 23, 25, 27-29, and 31 are separate counts of the same offense of wire fraud, in violation of 18 U.S.C. § 1343. Each Count corresponds to a specific date and wire transaction in an amount more than $2,000, as itemized in the Indictment:

| Count | Work Order No. | Work Order Invoice Amount | Invoice Submission Date |
|---|---|---|---|
| 5 | 32900277 | $3,163.60 | April 13, 2016 |
| 6 | 32898671 | $8,910.34 | June 8, 2016 |
| 7 | 32978774 | $2,450.60 | June 22, 2016 |
| 8 | 33305631 | $9,219.40 | October 6, 2016 |
| 11 | 33508495 | $2,326.00 | November 11, 2016 |
| 12 | 33438136 | $9,446.98 | November 17, 2016 |
| 14 | 33638612 | $4,036.92 | January 16, 2017 |

13

| 15 | 33939106/33798224 | $4,236.00 | February 3, 2017 |
| 23 | 35381594 | $8,724.33 | April 23, 2018 |
| 25 | 35381257 | $5,513.60 | May 1, 2018 |
| 27 | 35817347 | $9,397.40 | July 31, 2018 |
| 28 | 35469754 | $7,344.00 | August 3, 2018 |
| 29 | 35878242 | $5,107.20 | September 17, 2018 |
| 31 | 35982503/35531027 | $7,324.64 | September 20, 2018 |

(*See* Indictment, ECF No. 1.) The parties do not dispute that the contracts that govern these fourteen Counts are the January 2016 Supplier Agreement (ECF No. 21-2) and the June 2018 Supplier Agreement (ECF No. 21-3) nor do they dispute that the Court may review these documents in addressing Defendant's Motion to Dismiss. *See United States v. General Dynamics Corp.*, 644 F. Supp. 1497, 1500 (C.D. Cal. 1986) ("the Contract is the very subject of the indictment").

The wire fraud statute, § 1343, criminalizes the use of wires to execute "any scheme or artifice to defraud." 18 U.S.C. § 1343. The elements of this crime are as follows:

1) A scheme to defraud;

2) Use of an interstate wire in furtherance of the scheme; and

3) A "material" statement [or omission] in furtherance of the scheme.

*Id.*; *see also Neder v. United States*, 527 U.S. 1, 25 (1999) ("materiality … is an element of federal mail fraud, wire fraud, and bank fraud statutes," which must be submitted to the jury); *United States v. ReBrook*, 58 F.3d 961, 966 (4th Cir. 1995).

Defendant argues that the fourteen Counts at issue fail to state offenses because he could not have made a "material" statement or omission when he submitted invoices over $2,000 without subcontractor invoicing information because such documentation was not required by the applicable contracts. Defendant relies on the "Addendum" in the January

14

2016 and June 2018 Supplier Agreements that distinguishes between firm-fixed price proposals and not-to-exceed proposals and asserts that the Counts at issue involved firm-fixed price proposals only, which did not require any subcontractor documentation. (*See* ECF No. 21-2 at 13-15; ECF No. 21-3 at 15-17.) Specifically, Defendant emphasizes the language in the Addendum that invoices for $2,000 to $25,000 "shall contain a copy of the original quote approved by the USPS Facilities Project Manager, receipts for rental equipment, and photos to the extent such photos can accurately represent the work executed." (*Id.*) Defendant interprets this language to mean that he was not required to submit subcontractor invoicing for such invoices.

The Government, on the other hand, cites to the Supplier Agremeents' general requirement that:

> If the work is subcontracted (USPS only), subcontractor's invoice(s) must be attached to provider's invoice. A copy of the fully itemized invoice that shows labor rates, labor hours, total workers on location, itemized materials, and a full description of the work. If this is not provided, the invoice will be rejected back until ECMOR secures this information. A subcontractor's quote cannot be used as an invoice. Support must be an actual invoice provided by subcontractor.

(ECF No. 21-2 at 1; ECF No. 21-3 at 2.) The Government also relies on language in the Addendum that provides: "[m]arkups on work subcontracted by Supplier shall be allowed in accordance with the following: the Postal Service will allow and pay for one (1) tier of subcontractor markup, and in all cases, any markup by Supplier on subcontracted work shall be clearly identified on the initial cost proposal." (ECF No. 21-2 at 13-15; ECF No. 21-3 at 15-17.) The Government interprets "in all cases" to cover all proposals, whether firm-fixed

15

price proposals or not-to-exceed proposals. Defendant asserts that this "markup" requirement applies only to not-to-exceed proposals, and not to firm-fixed proposals.

It is the role of the jury, and not of this Court, to determine the materiality of Defendant's statements or omissions in furtherance of his alleged scheme to defraud. *See Neder v. United States*, 527 U.S. 1, 25 (1999). That determination in this case necessarily relies on the interpretation of the Supplier Agreements and the Addendum attached to them, which, in turn, relies on facts which must be determined by the jury. Defendant, relying on the United States Court of Appeals for the Fourth Circuit's dicta in *United States v. Race*, 632 F.2d 1114 (4th Cir. 1980), asserts that if he can show that his understanding of the contracts was a reasonable one, then he cannot be criminally liable under the wire fraud statute.

In *Race*, the Fourth Circuit indicated that "whenever a defendant's statement or action under a contract accords with a reasonable construction of the enabling language of the contract, the Government will not have carried its burden of 'negativ(ing) any reasonable interpretation that would make the defendant's statement factually correct.'" 632 F.2d at 1120. Defendant's reliance on this principle from *Race* is misplaced for several reasons. First, the Fourth Circuit rendered its decision *after* a trial and jury verdict, during which the Fourth Circuit noted "there [was] not evidence in the record to support a finding by the jury that the defendants did not believe in good faith" that their interpretation of the contract was reasonable. *Id.* at 1121. That is simply not the posture of this case. Second, the dicta from *Race* was explicitly rejected by the Fourth Circuit in *United States v. Sarwari*, 669 F.3d 401, 407 n.3 (4th Cir. 2012), where the Fourth Circuit "disavow[ed] the *Race* dicta" that "a false statement conviction 'could not stand' if a defendant's statement accords 'with a reasonable

16

construction' of the information sought." As a result, it cannot be said that the Fourth Circuit mandates the dismissal of wire fraud charges when a Defendant can show that his understanding of the contracts at issue was a reasonable one.

In any event, this Court cannot determine as a matter of law that Defendant's understanding was reasonable nor that it was the *only* reasonable understanding of the contracts in question. It may well be that Defendant acted reasonably in not providing the subcontractor invoicing for the Counts at issue, but this determination rests on additional facts, such as the parties' actual course of dealing regarding such invoices. That determination must be left to the jury. At this stage, the Court is satisfied that the subject Counts are sufficient to state offenses of wire fraud. Accordingly, Defendant's Motion to Dismiss Counts 5-8, 11-12, 14-15, 23, 25, 27-29, and 31 of the Indictment (ECF No. 21) is DENIED.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Strike as Surplusage the Allegation that the Alleged Scheme Sought to "Defraud EMCOR" (ECF No. 20) is DENIED, and Defendant's Motion to Dismiss Counts 5-8, 11-12, 14-15, 23, 25, 27-29, and 31 of the Indictment (ECF No. 21) is also DENIED.

A separate Order follows.

Dated: October 9, 2020                    _____/s/_____
                                          Richard D. Bennett
                                          United States District Judge