**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Jefferson M. Gray*
*Assistant United States Attorney*
*Jefferson.M.Gray@usdoj.gov*

*Suite 400*
*30136 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4915*
*MAIN: 410-209-4800*
*FAX: 410-962-3091*

August 20, 2021

The Hon. Richard D. Bennett
United States District Court Judge
101 W. Lombard Street
Baltimore, Maryland 21201

                Re:    *United States v. Liberto*
                        Crim. No. 1:19-cr-00600-RDB

Dear Judge Bennett:

      We are writing to address misstatements in, and potential misimpressions that may otherwise be created by, defense counsel's letter of August 17th, as well as to respond to other arguments advanced by defense counsel.

      The most significant misstatement in defense counsel's August 17th letter is the first sentence of the letter's second paragraph: "that the government notified us in June, just two weeks before the then-scheduled trial date, that *the copies of the 67 job files* that it had produced in March 2020 had been incomplete." (Emphasis added.) Defense counsel's language implies that the original production of every single one of these 67 files was incomplete. That was not the case.

      As the July 7th trial date approached and counsel reviewed the government's job file exhibits associated with Counts 2 through 32, the government's lead counsel thought he recalled seeing a few other documents in these files that were not included. The government's draft exhibits had been prepared using the Bates-stamped Sierra Construction documents for the charged jobs that the government produced to the defense a full 15 months earlier, on March 23, 2020. Accordingly, the government's trial team compared the draft exhibits with the original job files.[1]

      This review established that, for the job files related to the individual wire fraud counts (2-32) in the indictment, the previously produced copies of 8 of the 31 job files

---

[1] The individual job files are not voluminous. The complete re-production of the 31 job files relating to the indictment counts on June 22, 2021 totaled 393 pages (94% of which had previously been produced 15 months earlier), or an average of about 12 pages per file. (We reproduced the files in their entirety, whether an individual page or file had an issue or not, so that the Bates numbers would run in a single consistent sequence.) All 31 of the Sierra job files for the indictment counts fit comfortably in a single redweld file folder.

The Hon. Richard D. Bennett
August 20, 2021
Page 2

(involving Counts 3, 8, 12, 14, 16, 23, 25, and 28) were missing a combined total of 16 pages. In six other instances – involving the job files relating to Counts 9, 10, 11, 22, 23, and 28, so affecting a total of 12 of the 31 substantive counts – we also discovered that minor notations such as telephone or fax numbers and in one case, a post-it with a note on it – that appeared on the inside covers of the job files had been overlooked in the copying process.

In the case of the remaining 19 job files for the indictment counts – roughly two-thirds of the total – we simply provided better scans of the job file covers if they were not in color, if the file label along the folder edge was only partially copied, or if a small reminder along the very bottom edge of the front file cover to pay the subcontractor had been missed.

The balance of the 67 job files referred to by defense counsel consisted of a group of 36 others that we had identified at the time of our discovery conference with the defense on January 23, 2020 as being those from which we were most likely to select any other jobs for use as exhibits at trial. We had set these aside because the total number of job files seized during the search at Sierra's offices in late November 2018 totaled approximately 3,000, and we felt it was appropriate to do what we could to mitigate the burden of pretrial preparation on the defense by identifying a far smaller group from which the government's actual trial exhibits would most likely be drawn.

After we discovered the omissions in the prior production of the indictment count files in mid-June, we also reviewed the March 2020 production for these 36 files. As the table included in our June 29, 2021 transmittal letter (attached as **Exhibit 2**) with this production indicates, the copying issues with this group of files in large part involved problems with the copying of the legal sized job file folders – either getting the complete file label copied, or overlooking what were usually small notations appearing on the inside of the folder. For this group of files, we produced 92 pages of new or recopied material. Nearly half of these (at least 44 pages) consisted of job file covers that we recopied because part of the file label or (less often) some text along the edge of the file jacket had not fully copied,[2] or because some notation or a small post-it on the inside covers or back of the file jacket had been missed.

Of the remaining "new" pages we produced in connection with the other 35 job files, 13 consisted of duplicate pages from a request-for-proposal brochure produced by a security company for Sierra in connection with a door alarm repair project at the

---

[2] In those instances where these types of copying problems were present, these problems would usually have been apparent to the defense when they first reviewed these files after they were produced in March 2020. But the defense never raised any complaint about issues like these in the 15 months that passed between the original production date and the Government's identifying this issue in mid-June 2021.

The Hon. Richard D. Bennett
August 20, 2021
Page 3

Capitol Heights Post Office, where we had already produced the *other* copy of the same brochure that was in the file. Many of the remaining overlooked pages likewise came from this same job file.

Again, the minor character of these issues is demonstrated by the fact that at no point between the original production of the documents relating to the other 36 job files in March 2020 and our supplemental production in late June 2021 did the defense indicate to us that they believed that anything of significance had been omitted or not included in this production.

The Government certainly regrets that these problems occurred. That is why as soon as we suspected there was an issue, we conducted the audit and corrected the problem with the indictment count files within a single business day.

Defense counsel's August 17th letter also advances a misleading claim to the effect that two additional "versions" of the job files were produced in the government's initial production on February 4, 2020 and in the government's production of Jencks material on June 25, 2021. Each of these consisted of grand jury exhibits.

In an effort to get an initial production out to the defense as soon as possible, on February 4, 2020 – a mere two weeks after the defendant's January 20, 2020 arraignment – the government produced 301 pages of grand jury exhibits that consisted of documents drawn from the job files. These represented a selection of the most important documents relating to each transaction. These exhibits were clearly marked with grand jury stickers. We discussed the reasons for making the initial production on February 4th in a letter to the defense concerning various discovery matters dated December 8, 2020:

> Thus, as part of our initial production on February 4th [2020], we went ahead and produced the grand jury exhibits that related to particular job files, although obviously the grand jury transcripts themselves were not required to be produced under the Jencks Act until shortly before trial. These were the records that we produced with the production numbers USA-016479 – 016780. As you recognize, that 301 pages of records would not be likely to include absolutely every page from the 30 job files that were the subjects of the counts charged in the indictment. Rather, this was instead a preliminary production that was intended to give you a head start on understanding the charges.

When we returned to the grand jury this spring to obtain the superseding indictment, we started with the exhibits used with the previous grand jury, but also supplemented these with copies in some cases of additional documents from the job files, and then organized them to follow the chronological time sequence set forth in the handwritten notes on the job file cover. Thus, once again, we never represented that the

charged count exhibits used for the superseding indictment included everything that was in the original job files.

There is accordingly nothing surprising, revealing, or concerning about the fact that the grand jury exhibits used with either the original or the second grand jury are not coextensive with the contents of the original job files. Thus, these further two "versions" of the job files that defense counsel offers up in an effort to suggest that the original job files are incomplete and unreliable are simply red herrings, as they constitute an apples-to-oranges comparison between the original job files and selections of certain documents from them that were made for presentation to the two successive grand juries that considered this matter.

Defense counsel's assertion that "any difference is significant" between "these multiple versions of each job file" is therefore wide of the mark. That is certainly not the case where the difference results from the selection of particularly significant documents for presentation to the grand jury. And the difference is adequately explained where it results from oversights in the original copying process for the March 2020 production that have since been identified and corrected.

Finally, defense counsel suggests that it is only when the parties exchange their trial exhibits on September 13th that the defense will know "which of the several iterations of the job file for each substantive count the government intends to offer up at trial". That concern is easily addressed, for the answer should already be apparent. Our trial exhibits for the job files will be derived from the scans made for July 22nd and July 29th re-productions.

Contrary to defense counsel's assertions at pages 2-3 of his August 17th letter, it is common for courts to make pre-trial determinations of admissibility, particularly with regard to business records and/or documents seized in a search (as well as to many other kinds of evidence and statements). In particular, where admission under the business records doctrine of FED. R. EVID. 803(6) is at issue, the necessary conditions can be shown by the testimony "of the custodian or *another qualified witness*" (emphasis added). Establishing whether a witness is "qualified" is determined pursuant to FED. R. EVID. 104(a), which emphasizes both that "The court must decide any preliminary question about whether a witness is qualified" and that "In so doing, the court is not bound by evidence rules, except those on privilege." Thus, otherwise inadmissible hearsay testimony may be considered in a preliminary, non-jury hearing to determine whether a witness is "qualified" under Rule 803(6). *In re Intern. Management Associates*, LLC, 781 F.3d 1262, 1268 (11th Cir. 2015) ("when deciding whether an exception to the rule against hearsay applies, the court may consider any unprivileged evidence – even hearsay").

The phrase "other qualified witness" in Rule 803(6) is given the broadest possible interpretation. *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990) (phrase is "broadly interpreted to require only that the witness understand the record-keeping

system"); *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986); *United States v. Keplinger*, 776 F.2d 678, 694 (7th Cir. 1985). Thus, a "qualified witness" for purposes of Rule 803(6) need not be someone who "personally participated in the creation or maintenance of a document," nor need he or she have personal knowledge of the entries in the records. *Keplinger*, 776 F.2d at 693; *In re Intern. Management Associates*, LLC, 781 F.3d at 1268 ( "testifying witness does not need firsthand knowledge of the contents of the records, of their authors, or even of their preparation.").

      Persons such as bankruptcy trustees or investigating law enforcement agents can therefore be "qualified" witnesses under Rule 803(6). *In re Intern. Management Associates*, 781 F.3d at 1268 (trustee could testify as a qualified witness based in part on his interviews of the company's principals and employees, in which he learned how the company created its records); *Hathaway*, 798 F.2d at 906 (FBI agent could be a "qualified witness," because "contrary to defendant's argument, there is no reason why a proper foundation for application of Rule 803(6) cannot be laid, in whole or in part, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted"); *United States v. Franco*, 874 F.2d 1136, 1138 (7th Cir. 1989) (narcotics agent who conducted search of money exchange business and spoke to its owner and an employee about the manner in which they kept the records was a "qualified witness" who could authenticate the business's records); *United States v. Gordon*, 2019 WL 4303046, at *11 (D. Me. Sept. 11, 2019) (government's case agent could serve as the affiant on certificate of authenticity because "Special Agent Thresher can describe Bancorp's record-keeping system based upon his personal observations.").

      In this case, while the government will be calling as witnesses a number of former Sierra project managers who personally handled matters relating to the relevant job files in this case, the government's case agent, USPS-OIG Agent Sean Baer, served as the affiant on the search warrant and was the lead agent supervising the execution of the search warrant at Sierra's offices in late November 2018. He has since reviewed hundreds of Sierra's EMCOR job files, both to identify files for use with witnesses in the grand jury investigation and as part of a group of agents working to determine the Postal Service's losses as a result of the defendant's conduct. He has furthermore interviewed or participated in witness preparation sessions with a number of Sierra's former project managers who were involved in processing work orders received from EMCOR and in preparing the job files. The court should therefore hold a pre-trial hearing to establish whether Agent Baer is a "qualified witness" under Rule 803(6) who can also authenticate the job file records the government seeks to introduce.

      Beyond that, we urge the Court to establish a date for the parties to submit briefs addressing the authenticity and admissibility issues the defense contends the job files present prior to trial. Any other approach will force the parties into the position of potentially preparing briefs addressing these issues even as this trial is proceeding on a five-day-a-week schedule, and will force the Court and its staff to either consider these issues on an abbreviated time frame or take breaks in the proceedings so these matters may be addressed.

The Hon. Richard D. Bennett
August 20, 2021
Page 6

                                              Very Truly Yours,

                                              Jefferson M. Gray

cc:  All Counsel (by ECF)