

**Martin S. Himeles, Jr.**

PARTNER
mhimeles@zuckerman.com
410.949.1144

September 26, 2021

**VIA ECF**

The Honorable Richard D. Bennett
United States District Court Judge
U.S. Courthouse
101 W. Lombard Street, Chambers 5D
Baltimore, Maryland 21201

      Re:   *United States v. Joseph Liberto*, Crim. No. RDB-19-0600

Dear Judge Bennett:

      I take no pleasure in reporting to the Court yet another eleventh-hour government production of documents, this time including documents that are exculpatory by any measure. Less than two weeks before trial, on Thursday evening, September 23, 2021, the government produced 631 pages that include a February 2008 interview memorandum of a postal employee the government may call at trial, and files concerning 60 Sierra construction jobs maintained by the Cumberland Post Office, 40 of which have been in the possession of Agent Sean Baer, the government's case agent, *since February 2018*. We first learned of the existence of the interview memo and documents during a conference call the day before their production. As explained more fully below, this late production of *Brady* material has yet again prejudiced Mr. Liberto, and given the history of discovery in this case, it can only be remedied by sanctions that are narrowly tailored to remedy the harm related to the evidence withheld.

      I should say at the outset that Mr. Liberto is not requesting a postponement of the trial. Indeed, even if that were an option, he would oppose it. He wants nothing more than to proceed to trial, and we are prepared to move forward. But this latest violation and the pattern of violations it reflects must be addressed. We therefore respectfully request that the Court take steps to prevent any further prejudice to Mr. Liberto caused by the case agent's shockingly cavalier disregard for Mr. Liberto's rights and this Court's orders.

I.  Background

As the Court is aware, in November 2018 the government executed a search warrant at the offices of Sierra Construction, LLC ("Sierra"). Agent Baer's affidavit in support of the search warrant described six specific jobs and alleged that Sierra had failed to disclose its use of subcontractors in order to inflate the amount it charged the Postal Service. Three of those jobs were performed at the post office in Cumberland, Maryland. In the search warrant affidavit (Ex. 1), Agent Baer referred to his interview of the maintenance manager of the Cumberland post office but did not identify him or indicate that he had provided records to Agent Baer. Ex. 1 at ¶¶ 20, 34, and 39. The only Postal Service records mentioned came from the Postal Service's centrally maintained facilities management database. *Id.* at ¶ 11. The Cumberland maintenance manager is now known to be Gary Howser.

As early as January 23, 2020, during the initial discovery meeting of government and defense counsel—which Agent Baer attended—defense counsel requested and government counsel agreed to provide copies of all witness interview memos. Ex. 2 (January 27, 2020 letter concerning discovery meeting). The government subsequently produced numerous interview memos, including memos concerning Agent Baer's interviews of more than a dozen postmasters and other employees of local post offices. Jencks material was provided during June of this year. In none of the government's productions was there an interview memo for Mr. Howser, the Cumberland maintenance manager. Ex. 1 at ¶ 44.

On several occasions, defense counsel expressed concerns about the completeness of the government production of interview memos. In a letter dated April 23, 2020, government counsel responded to an inquiry arising from those concerns, assuring defense counsel that the government had produced "all of our interview reports." Ex. 3 at 4.

The Court is all too familiar with government counsel's disclosure, during final preparation for the then-scheduled July 7, 2021 trial, of omissions in its production of the key job files in its case, which led to a postponement of the trial. With the parties in the final stages of preparation for the October 5 trial, on Wednesday afternoon, September 22, government counsel informed defense counsel by telephone that during a trial preparation session with Gary Howser, government counsel became aware that Mr. Howser maintained records for jobs at the Cumberland post office, which included packets of documents and in some cases notes concerning each job. Government counsel stated that they would be producing these documents, which include some that Agent Baer obtained last week and others that he already had, which the government described as "older notes." The government did not indicate

how many documents Agent Baer had just obtained or how many had already been in his possession, but promised to produce these files. Counsel commented that the government did not intend to use the documents at trial. Moreover, government counsel mentioned an interview memo for Mr. Howser, and when told that no interview memo had ever been produced for Mr. Howser, agreed to look into whether it had been produced.[1]

The documents—consisting of 76 PDF files totaling 631 pages—were produced on Thursday evening, September 23, just 12 days before the trial date. Among them are a memorandum of Mr. Howser's interview on February 2, 2018, more than 3½ years ago, and 60 job-related packets that the government had obtained from Cumberland post office files. In response to defense counsel's inquiry, the government advised on Friday afternoon that 40 of the Cumberland Post Office job files (312 pages) had been provided to Agent Baer in February 2018. The additional 20 files related to other Sierra jobs at the Cumberland post office (162 pages) and were identified as files that Agent Baer obtained from Mr. Howser last week.

## II.   The Cumberland Post Office Files

Defense counsel have just begun to review them, and considerably more work is required to fully understand their significance. But it was immediately clear that the files include documents that are *Brady* material. For example, the heart of the alleged scheme is the concealment of Sierra's use of subcontractors and the amounts they charged from the Postal Service. To that end, the Superseding Indictment alleges:

> It was further a part of the conspiracy and the scheme to defraud that JOSEPH LIBERTO instructed and caused other Sierra employees to instruct subcontractors that they should not leave copies of their proposals, estimates, or invoices with postal employees at the facilities where they performed their repair work, nor transmit those to the employees at EMCOR or the Postal Service who were identified in the work orders.

---

[1] Government counsel also advised that the government would be producing an additional 13 invoice packages sent by EMCOR to the Postal Service corresponding to job files on the government's exhibit list. Again, they stated that the government did not intend to use these documents at trial. While their late production raises questions as well, the remedy we seek is for the *Brady* and other concerns raised by the Cumberland post office files.

*Id.* at ¶ 31c.

From our review of the production so far, it is clear that several of the recently produced files include paperwork left behind by Sierra's subcontractors on those jobs and Mr. Howser's notes of his interactions with them. Indeed, some of the paperwork states the time for which the subcontractors were charging and the amounts charged. Additionally, Mr. Howser's notes reflect his frequent interactions with the subcontractors, whom he knew were not Sierra employees, and the Postal Service project managers, from whom the government alleges Mr. Liberto's purported scheme was designed to hide Sierra's use of subcontractors.

Two examples are attached. One, the Cumberland Post Office file concerning a 2017 work order (no. 33818831), includes a copy of the service report of Stanley Access Technologies, Sierra's subcontractor on the job. Ex. 4 at USA-022301. The service report lists the number of hours Stanley's technicians worked and describes the work they performed. This is one of the files that has been in Agent Baer's possession since February 2018.

A second Cumberland Post Office file concerns another 2017 work order (no. 38649736). It includes a copy of a quote from Tyco SimplexGrinnell, another Sierra subcontractor on that job, along with email correspondence between Mr. Howser and the subcontractor and a handwritten note referring to Kevin Fink of Sierra, a key government witness. Ex. 5. The file reflects that the subcontractor sent its proposal to the Postal Service, and the result was predictable: The postmaster signed and returned the subcontractor's proposal, and a series of phone calls and emails were necessary to straighten out the resulting confusion and ensure that that the Postal Service did not pay the bill for Sierra's subcontractor. As the subcontractor's employee put it in an email to Mr. Howser, he "got confused as to whom would sign the proposal." *Id.* at USA-022340. This file, which Agent Baer claims he first obtained last week, is powerful evidence of the entirely innocent reason why a general contractor would tell its subcontractor not to leave quotes and invoices with customers.

These are but a few examples of how the recently produced documents contradict the government's allegations, which were apparent even from our preliminary review. The files undermine the government's case in other ways that we are not prepared to disclose to the government in advance of trial.

Moreover, the recently produced files raise additional concerns about the government's satisfaction of its discovery obligations even today. The first two Cumberland jobs that are in Agent Baer's search warrant affidavit were completed

by May 2017, well before the February 2018 interview of Mr. Howser. But as far as we can determine, Mr. Howser's files for these two jobs are nowhere to be found among the files the government has produced. Only his file for the third job was produced—and it is one of the files that, according to the government, Agent Baer first obtained last week. If Agent Baer has in fact produced all the files that he obtained from Mr. Howser before last week, either he obtained the 40 files from Mr. Howser before signing the search warrant affidavit but did not obtain the files for any of the three jobs in the affidavit, two of which were completed before his interview, or he did obtain those files in 2018 and is still withholding them, has lost them, or worse.

Moreover, Agent Baer continued to seek Mr. Howser's assistance in the investigation during the period between the February 2018 interview and the November 2018 search warrant affidavit. In an August 13, 2018 email included in the recent production, Agent Baer told Mr. Howser, "I am working on the RTU issue still, and am meeting with the HQ project manager tomorrow. More to come." Ex. 6. An "RTU" is a rooftop unit—an HVAC system that is designed to go on the roof of a commercial building. The fifth job in the search warrant affidavit is in fact a repair of a rooftop unit, as EMCOR's work order for the job reflects. Ex. 7. Thus, it appears that Agent Baer was "working on" an "issue" related to the second Cumberland job in the search warrant affidavit, and meeting with his project manager at headquarters, just three months before signing the affidavit. Yet he has not produced Mr. Howser's file or any other documents relating to his own work on that job.

It is beyond implausible that Agent Baer obtained 60 files from Mr. Howser, but he never obtained files corresponding to two of the three jobs on which the search warrant was based. If those files have been lost or destroyed, the defense is entitled to know.

### III. Remedy

This is the second time the government has disclosed on the eve of trial that it has failed to produce documents, resulting in several hundred pages dumped on the defense at the eleventh hour. Indeed, we are still grappling with the consequences of the government's previous late production. Mr. Liberto has incurred untold thousands of dollars in additional legal fees as his counsel have spent countless hours analyzing the difference in the job file exhibits and determining how they affect the government's case, and therefore Mr. Liberto's defense. On Monday we will continue the contentious litigation caused by the mismanagement of those files. That alone made it impossible for us to have confidence that any of the job files are complete.

Now additional documents have come to light—documents that were never produced in any form and are undeniably exculpatory. Of course, the obligation to produce discovery—and especially *Brady* material—is an obligation of government counsel, and the government bears responsibility for these violations to the same extent as if the documents were in government counsel's personal possession. Moreover, Mr. Howser's interview memo, which defense counsel only received on Thursday evening, describes Mr. Howser's practice of printing documents concerning maintenance jobs and making notes on them. Government counsel knew that these files existed at one time, and they were obligated to inquire as to their continued existence. From even a brief glance at the Cumberland Post Office job files, it should have been apparent to the government that they are not just material to Mr. Liberto's defense—they are exculpatory.

The prejudice to Mr. Liberto caused by this second late production, on top of the first, is clear. After the long delay caused by the pandemic and the additional delay caused by the last postponement, defense counsel have already been forced to spend time that we cannot spare preliminarily reviewing these 60 files, and continuing our efforts to make sense of them would require still more time that should be spent preparing to examine the government's witnesses and our own based on evidence that was produced when the Court's order, Rule 16, and the constitution required.

As a starting point, the Court should impose a sanction that ensures that Mr. Liberto is not prejudiced by the government's untimely production of these documents. The Court has ample discretion to fashion a remedy for violations of its scheduling orders. *See, e.g., United States v. Barile*, 286 F.3d 749, 758-59 (4th Cir. 2002) (prohibiting expert from testifying concerning his opinion where government's expert disclosure lacked specificity); *United States v. Muse*, 83 F.3d 672, 675 (4th Cir. 1996) ("The Federal Rules of Criminal Procedure provide a district court with discretion in determining the proper remedy for a discovery violation.").

We ask the Court to foreclose the government from calling Mr. Howser or presenting evidence concerning Sierra's work at the Cumberland post office.[2] This

---

[2] We do not know whether the government intends to call any of the subcontractors who worked at Cumberland, but if it does, it should be foreclosed from examining them concerning Cumberland jobs. If defense counsel cross-examines witnesses concerning Cumberland jobs, the government would be allowed to examine those witnesses concerning Cumberland to the extent responsive to the defense's cross-examination. Of course, defense counsel should not be foreclosed from examining

much, at least, is a modest sanction in comparison to the prejudice to Mr. Liberto, and indeed, in light of these documents, it may be no sanction at all. None of the substantive counts of the superseding indictment are based on Cumberland jobs. The government's exhibit list includes one five-page trial exhibit related to Cumberland jobs, consisting of five work orders signed by Mr. Howser. (Ex. 8). These are not proposals or invoices of Sierra or subcontractors—the documents the government has repeatedly described as the important ones in the case. We presume that the government intended to offer this exhibit through Mr. Howser, and it may have already decided not to call him in light of the exculpatory evidence it has produced.

Additionally, the government has indicated that it intends to call Agent Baer as a summary witness to testify concerning the review of some 3,500 Sierra job files by himself and a team of agents under his direction. He will sponsor a summary exhibit, Government's Exhibit 36 (the first page is attached as Ex. 9), which lists 2,612 jobs that the government contends were overcharged. Some small number of those jobs include work performed at the Cumberland post office. The summary exhibit includes only the state in which each job was performed and not its precise location, so defense counsel do not know the precise number of Cumberland jobs included, but there are some.

For reasons wholly independent of this latest problem, we do not believe that Agent Baer will be able to establish the accuracy of the summary exhibit, even viewing the evidence in the light most favorable to the government, and we will object to it on that ground. We have also advised the government of our objection to certain of the headings on the exhibit, which create further problems which the parties may or may not be able to resolve. In light of the government's recent production, we ask that the government identify all Cumberland jobs included in Exhibit 36 and that it not be permitted to examine Agent Baer concerning those jobs. If the defense cross-examines him concerning Cumberland jobs, the government would be free to respond on redirect with respect to the Cumberland jobs on which Agent Baer was cross-examined.

In sum, Cumberland jobs account for only one of the government's proposed trial exhibits, and a small part of its trial testimony. Foreclosing the government from presenting evidence concerning these jobs would only minimally limit the

---

witnesses concerning Cumberland documents, such as the exculpatory evidence discussed here. They would also be permitted to use the Cumberland evidence to impeach Agent Baer.

government's presentation, if at all, but it would directly address one aspect of the prejudice that the government's untimely disclosures have caused.

Another more pervasive concern cannot be remedied in the same fashion. Neither the Court nor Mr. Liberto can have confidence that the defense has received all exculpatory evidence to which Mr. Liberto is entitled. "Because prosecutors are in a unique position to obtain information known to other agents of the government, they have an obligation to "disclose what they do not know but could have learned." *United States v. Cano*, 934 F.3d 1002, 1023 (9thCir. 2019) (internal quotations omitted); *see also Kyles v. Whitley,* 514 U.S. 419, 437 (1995) (the "individual prosecutor has a duty to learn of any favorable evidence known to [those] acting on the government's behalf"). Prosecutors are presumed to know of and have access to documents in the possession of an agency that participates in the investigation of the defendant. *Cano*, 934 F.3d at 1023; *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (prosecutors' duty to search for exculpatory evidence extends to "branches of government 'closely aligned with the prosecution'") (internal quotation marks omitted); *see also Love v. Johnson*, 57 F.3d 1305, 1314 (4th Cir. 1995) (The '*Brady*' right … is not limited to information in the actual possession of the prosecutor and certainly extends to any in the possession of state agencies subject to judicial control.").

The government's obligation here extends to documents in the possession of the Postal Service. *See, e.g., United States v. Palma*, No. 19-20626, 2020 WL 6743144, at *8 (E.D. Mich. Nov. 17, 2020) (slip copy) (government was required to inquire whether *Brady* materials were in the possession of federal agency that "provided detailed information regarding the facts and allegations that led to the indictment"); *USA v. Holmes*, No. 5:18-cr-00258-EJD-1, 2019 WL 5722573, at *2 (N.D. Cal. Nov. 5, 2019) (prosecutors "have possession of discoverable material where they have knowledge of and access to the documents, even if those documents are physically held by other government agencies. . . . An agency's participation in an investigation is sufficient, but not necessary, to establish that prosecutors have access to the agency's information.").

The belated disclosure of the Cumberland post office files raises the question whether government counsel have ensured that Agent Baer conducted an appropriate inquiry for exculpatory evidence at the post offices at which Sierra completed jobs that are part of the alleged scheme to defraud. Although Sierra worked at hundreds of postal facilities, and jobs at them are included in the government's alleged scheme, the indictment identifies thirty-one locations. At a minimum, we expect that the government determined whether those post offices and facilities also have job files or other records of Sierra's work, but we are no longer confident that such a search was

done or that resulting exculpatory documentation has been produced. We ask that the Court inquire of government counsel concerning 1) the efforts that they or the Postal Service have made to obtain evidence from the postal facilities the government has placed at the center of this case by including them in substantive counts, and 2) the measures they have taken to ensure that they have all documents Agent Baer obtained from Mr. Howser and from other local postal employees, and to determine whether any documents that were in his or his investigative team's possession are no longer available. The government's responses will determine what if any further action is needed.

Finally, as we were about to file this letter, we received from government counsel a letter addressing the Cumberland post office files. The government does intend to call Mr. Howser, but not until late in the government's case. Government counsel state that Agent Baer has assured them that he has no other materials received during his investigation that were not previously produced to us. This general assurance does not assuage our concerns.

We will be prepared to address this matter at tomorrow's pretrial conference and motion hearing, or at such other time as the Court may prefer.

Respectfully,

*/s/ Martin S. Himeles, Jr.*

Martin S. Himeles, Jr.


cc:    Counsel of record (via ECF)