IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
**(Northern Division)**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH EDWARD LIBERTO,<br><br>*Defendant.* | Crim. No. RDB-19-0600 |

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTIONS IN LIMINE**

**I.    Photo Metadata**

The photos of Sierra's work and the metadata associated with them will be critical evidence with respect to numerous of the substantive counts. Under Sierra's contract with EMCOR, Sierra was required to submit before and after photos with its proposals and invoices for each job that exceeded $2,000. As part of Sierra's regular business practice, it maintained a drive on its network, accessible to its employees, in which it maintained an electronic folder for each EMCOR job. These folders—assigned names that reflected the job location, EMCOR work order number, and some reference to the nature of the job—were the repository for the photographs (sometimes in subfolders with descriptive names). Sierra employees often, but not always, took the photos at the postal facility and  sent the photos to Sierra project managers by text message or by email to the project managers' work or personal email addresses, or uploaded the photos directly to the network drive. However transmitted, the photos were maintained by Sierra in the network folder for the job to which they related and selected from this repository for transmission to EMCOR and the Postal Service with Sierra proposals and invoices. Trial testimony will establish this business practice.

Postal Service agents seized the network drive from Sierra, and they created and later produced a forensic image of it. At defense counsel's request, a certified computer examiner employed by Zuckerman Spaeder, who has seventeen years of experience in digital forensics, created forensically sound copies of the folders for a number of jobs and worked with an outside vendor to generate images of specified photos, each with a one-page metadata sheet that includes the file name of the photo and the date and time created and modified reflected in the metadata. These photos and metadata sheets—which came from the drive image produced by the government—were included in our May 26, 2021 production of reciprocal discovery and accurately reflect the metadata associated with the photos as stored on Sierra's server at the time of the search.

The government's description of the photos and associated metadata printouts as reflecting "what purported to be the photos' associated metadata," MIL at 1, is disingenuous at best. Government counsel asserted during a telephone conversation with defense counsel that they did not have the ability to assess the metadata—but the government has had the network drive itself or the forensic image it created since 2018. The photographs and associated metadata were obtained from this government-produced image. To save the government the inconvenience of looking at their own original evidence for the photos and metadata, or to permit them to verify the data, in May we produced these images and metadata back to the government in the form we intend to use at trial. We subsequently produced as digital files the photos and metadata in the format that the Department of Justice has required for productions of electronically stored information in response to subpoenas since at least 2014 (which is also consistent with this Court's Suggested ESI Protocol). The government's innuendo suggesting that there is a question concerning the authenticity of the photos and metadata is especially ill-conceived in light of the minimal burden to establish authenticity, on which it relied in connection with Sierra's job files.

Attached as Exhibit 1 are two screenshots of two of the network folders from which the trial exhibit photographs were obtained (Defendant's Exhibits 39 and 85 (corresponding to jobs performed in Covington, VA (Count 12) and Warrenton, VA (Count 23)). See Ex. 1. These screenshots are what Sierra employees saw when they accessed the network drive. In light of the government's position, we will offer these screenshots at trial as well (and will add them to our exhibit list).

We have never contended, and will not we contend at trial, that the date created or date modified is *necessarily* the date a photo was taken. Likewise, we have not contended, and will not contend at trial, that the metadata indicates who took the photo. The metadata shows that the photos were taken *no later than the earliest of the dates provided*. For some photos, that date, in combination with other evidence, will support the contention that the photos were taken by Sierra employees. Other photos likely were not taken by Sierra employees, and the metadata will tend to show that as well.

When the government raised concerns because some photos had "created" dates after "modified" dates, we proposed that we reach a mutually agreeable stipulation to make clear that these dates are not necessarily the date the photos were taken, or that we present that information by affidavit—although that is not required to authenticate the photos and metadata or to establish that it is a business record. The government responded that it found our draft declaration too technical. In light of the government's motion, and our desire to avoid confusion, we have decided to offer the attachment to the draft declaration (Ex. 3), to which a column will be added after the dates taken and modified with the heading, "Photo Taken No later Than," listing in that column the earlier of the date and time created and modified. We would be happy to consider any other modifications the government might request. That will eliminate any possible confusion, and it is undeniably accurate, as the draft declaration established. Rather than disputing it, the government

has told us that it lacks the wherewithal to evaluate the statement—a remarkable assertion coming from the Department of Justice.

The Sierra job folders on the network drive are business records just as clearly as the paper job files on which the government relies. Their metadata is no more confusing that the dates in the paper job files (e.g., paper copies of proposals where dates were not updated when revised proposals were submitted months later). Testimony of Sierra project managers will establish that the hard drive folders are business records, and the proffered testimony here establishes that their authenticity—which is not actually disputed.

Finally, the government's assertion that the defense call each Sierra employee who took each photo for it to be admitted in not required by the Federal Rules of Evidence, and is yet another government attempt to determine how the defense presents its case. Moreover, it will take up additional trial time with unnecessary and tedious testimony. The court can rule on the authenticity of the photos and metadata and their admissibility as business records.

**II.     Impeachment Exhibits**

The government complains about reciprocal discovery, but the issue it raises is in fact one that relates to the exhibit list—and a meritless one at that. Because the government casts the issue as reciprocal discovery, however, we first address its misguided complaint that it took too long for us to "finally" produce reciprocal discovery, and its suggestion that there may be documents to which it was entitled that were not produced.

The government has been investigating Mr. Liberto and Sierra since April 2016. After the November 2018 raid of Sierra, Agent Baer and a team of agents began more than a year's work reviewing more than 3,500 seized job files, finally identifying roughly 2,600 jobs that the government alleges were fraudulently billed. The indictment was returned in December 2019. By the time the government made its first productions in February and March of 2020, which included

some of the documents that it has subsequently identified as trial exhibits, it had spent more than three years investigating the case and 16 months analyzing Sierra's job files.

Defense counsel were retained in December 2019 and met with the government the following month to request access to Sierra's seized files. In February 2020, we obtained access to the room in Bethesda where Agent Baer stored thousands of job files and other documents seized from Sierra (excluding the 67 job files kept at the United States Attorney's Office and 66 other files that were in the possession of Agent Baer). We arranged for a vendor to scan those documents and began our review of them and other documents the government produced, including documents subpoenaed from EMCOR and subcontractors, the twenty-five hard drive images and other data seized, and 81,367 USPS emails. In mid-June 2020, we received a draft of the spreadsheet prepared by Agent Baer regarding the government's alleged loss calculation, which identified for the first time the more than 2,600 jobs that are the basis of the government's case. *See* Ex. 4 at 3. Over the course of the 14 months after receiving the government's initial productions, we analyzed this enormous volume of job files and other documents seized and subpoenaed by the government, including three subsequent government document productions.

As we have repeatedly explained to the government, the vast majority of the exhibits on which we will rely at trial are drawn from these materials, produced to us by the government. *See, e.g.* Ex. 7. In May 2021, we produced the relatively few documents we intended to use in our case-in-chief that were not already in the government's possession—and, for the government's convenience, documents we had identified and intended to use that related to the substantive counts of the indictment, even though the government already had most of them. These included documents from the network drive image the government produced, and the photographs and metadata discussed above. Like the government, we supplemented our initial production with additional documents as we identified them, but most were included in the first production.

5

The supposed reciprocal discovery issue that the government now raises was already addressed with our initial production. The government argued: "Of course, the discovery rules do not require you *to send back to us* copies of every document you have received from us. Rather, you need only produce *the ones* you intend to use as substantive evidence at trial." Ex. 6 (emphasis added). But as we pointed out in response, the purpose of reciprocal discovery is not to require the defendant to identify which of the documents *produced by the government* the defense will include on its exhibit list; it is for the defense to produce to the government documents that the government *does not have* that the defense will use in its case-in-chief. Ex. 6.[1]

Yet, even as the government complains that the defense has not provided reciprocal discovery because we did not reproduce what the government produced to us, the government included on its exhibit list documents that were not identified in the government's discovery. According to the government's exhibit list, five of its exhibits are emails that were recovered from an image of Mr. Liberto's hard drive taken during the search of Sierra. *See* Gov. Exh. List Exhs. 1(j)-1, 1(j)-2, 1(j)-3, 1(j)-4, and 1(j)-5. Additional government's trial exhibits also include job files that were among the thousands made available for scanning in Bethesda but not otherwise produced.[2] We do not object to those exhibits based on any discovery violation; they were included in the materials in the government's possession made available to the defense, even if finding them required searching hard drives. The government cannot object on similar grounds.

---

[1] The case law is clear on this point. The issue arises most often when defendants unsuccessfully seek to compel the government not just to produce discovery, but to specify which documents it will use at trial, before it is required to provide its exhibit list. *See, e.g., United States v. Prince,* 618 F.3d 551, 561-62 (6th Cir. 2010) ("Rule 16 does not entitle a defendant to pretrial disclosure of the government's exhibit list."); *see also United States v. Warshak*, 631 F.3d at 296-97; *United States v. Lewis*, 594 F.3d 1270, 1280-81 (10th Cir. 2010); *United States v. Valerio*, 737 F. Supp. 844, 847 (S.D.N.Y. 1990).

[2] They were included in original job files made available at our request on July 15, 2021 and identified as trial exhibits by the government counsel's on August 31, 2021, pursuant to the Court's order that the job files the government would use must be identified by that date. Ex. 9.

With a few exceptions, Mr. Liberto's impeachment trial exhibits are well-familiar to the government and are among the materials that the government produced. By way of example, Sierra job files that would or might be used as evidence in Sierra's case-in-chief are included on the exhibit list. There are additional job files that we will use for impeachment, and they are not required to be on our exhibit list. Agent Baer and others working under his direction reviewed all these Sierra job files, and most are on his loss spreadsheet. Additionally, some of our trial exhibits are USPS emails that were produced by the government, and emails from Sierra's AOL email account, which are primarily on the hard drive images produced by the government, as the government's five exhibits from that account reflect.[3] All these impeachment trial exhibits will be used for that purpose, and the government has most of them. There is no reciprocal discovery issue here.[4]

The government's suggestion that it has not received reciprocal discovery is another attempt to keep out evidence of Sierra's performance under the contract that is inconsistent with the government's theory of the case. It seeks to protect its witnesses from fair cross-examination by expanding the standard for impeachment evidence when compiling an exhibit list in a criminal case. Under the government's theory, any exhibit used to impeach testimony that Mr. Liberto committed fraud is not an impeachment exhibit, because it also tends to show that he did not commit fraud, and therefore would not be impeachment. That is simply not the case. If it were, what that has long been viewed as impeachment evidence would now be required to be listed. A document used on cross-

---

[3] As a matter of convenience, we have obtained emails from the AOL server as well as from certain archives. But Sierra's AOL email is also available on various employee hard drives seized by the government.

[4] Even if the Rule 16 cases were controlling in determining which of the documents produced in discovery must be included on an exhibit list, the government's position would require the Courts to disregard the decades-long use of "case-in-chief" to refer to the part of a trial between the time that a party calls its first witness and when it rests. *See, e.g., United States v. Dunnigan*, 507 U.S. 87, 89 (1993)("The case in chief for the United States consisted of five witnesses...."); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 549 (1990)("At the close of Lytle's case in chief....").

7

examination to establish that testimony of a hostile witness is untrue, mistaken, or otherwise lacking in credibility is an impeachment exhibit, and the fact that in impeaching a government witness also supports the defense does not convert it to an affirmative exhibit. Mr. Liberto does not intend to offer his impeachment exhibits in his case-in-chief—even if they cannot be used to impeach government witnesses, and he is no required to list them. Nor does Fourth Circuit law—concerning reciprocal discovery—support a contrary rule.[5]

Although the exhibits not on our list will be used for impeachment only, we are mindful of the unprecedented circumstances in which the trial will take place, and the Court's and parties' shared interest in avoiding delay. We will review our exhibits with that in mind to determine whether any exhibits can be added to our list and copies provided to the government now without prejudicing Mr. Liberto.

## III.   There is no Good Acts Evidence

The government does not seek to exclude exhibits of "specific instances of law-abidingness," MIL at 5, because Mr. Liberto has not offered any. The government itself describes

---

[5] *United States v. Young*, 248 F.3d 260 (4th Cir. 2001), was decided under prior Rule 16, before the 2002 amendments changed "evidence in chief" to "case-in-chief." The court affirmed the district court's exclusion of a tape recording—never produced in discovery—to impeach the credibility of a witness pursuant to Fed. R. Evid. 403 because the recording would confuse and mislead the jury. The court's alternative holding affirming the exclusion of the recording when offered *in the defendant's case-in-chief* was based on the same Rule 403 analysis, and in the alternative on the district court's finding that the district court's application of Rule 16 was not an abuse of discretion. Far from embracing the government's claim that a defendant's "case-in-chief" includes cross-examination of government witnesses, the court skeptically under the old "evidence-in-chief" standard. *Id.* at 269-70. The decision reflects the court's view that the recording became "evidence in chief" only when offered during the *defendant's* case-in-chief—a point made even more compelling when the 2002 amendments replaced "evidence in chief" with "case-in-chief," which focuses more clearly on the part of the trial during which evidence is offered. *United States v. Harry*, 2014 WL 6065705 at *8 (D. N.M. 2014) (unpublished) ("*United States v. Young* should likely be interpreted as holding that evidence in chief may encompass both a party's cross-examination and a party's traditional case-in-chief, while case-in-chief encompasses only the time between which a party calls its first witness and the party rests.") (emphasis added).

the evidence it seeks to exclude as exhibits "relating to other EMCOR-assigned jobs that do not appear to involve the use of subcontractors, or where the defense apparently just wants to show that Sierra sometimes went above and beyond in responding to requests from EMCOR." MIL at 7. They are essential evidence of the course of dealing among Sierra, EMCOR, and the Postal Service under exactly the same contract as all 2,600 jobs that the government contends were fraudulent. This cynical motion is a brazen attempt by the government to offer only those EMCOR jobs that it believes support its fraud theory, and to obtain a blanket exclusion of evidence of other EMCOR jobs that bear on the parties mutual understanding of the contract, Mr. Liberto's good faith belief that Sierra was not overcharging the Postal Service, and almost every other issue in the case. Contract performance is not a good deed, and evidence of course of dealing is not irrelevant simply because it does not support the government's fraud theory—as the Court has already found in this case. *See* Mem. Op. Denying Motions to Dismiss and to Strike, ECF No. 40, at 17 (determination of contractual issues "rest on additional facts, such as the parties' actual course of dealing regarding such invoices. That determination must be left to the jury.").

The government cites cases addressing the admissibility of evidence that are galaxies removed from the evidence here. In *United States v. Molovinsky*, 688 F.2d 243 (4th Cir. 1982), the only Fourth Circuit case the government cites, the defendant sought to respond to forgery charges with testimony about his other unrelated "improbable and farfetched, if legal, money-making schemes," which included "a grandiose prepaid legal services plan, unrealistic financial transactions, dabbling in inventions and buying a lot of Maryland lottery tickets." *Id.* at 247 n.8. The Fourth Circuit found that the district court did not abuse its discretion in excluding testimony regarding prior unrelated schemes because "[t]o have allowed a meandering journey down such collateral paths would have distracted the jury from relevant evidence of the counterfeiting scheme itself, which was illegal." *Id.* at 247. Here, Mr. Liberto does not offer evidence of other unrelated

7793263.1

conduct; the government seeks to exclude evidence regarding Sierra's performance on "other EMCOR assigned jobs", MIL at 6—evidence that bears on Mr. Liberto's understanding of the contract that the government has put at the heart of this case.

The government's other cases likewise concern evidence offered to show the defendant's good character, as reflected by acts that had no relevance to any issue. *See, e.g.*, *United States v. Marrerro*, 904 F.2d 251, 260 (5th Cir. 1990) (finding no abuse of discretion to exclude testimony of accountant hired by defendant concerning patient survey responses and examples of defendant providing other services free of charge as character evidence where trial court "did, in fact, allow Marrero to introduce substantial evidence of her good character at trial"). None of these cases excludes evidence that is relevant to central issue in the case—here, the meaning of the contract as reflected in the parties' course of dealing, and Mr. Liberto's good faith. Indeed, excluding evidence of good faith because it happens to show the defendant's good character has been found reversible error in cases where the relationship of the evidence to the allegations is far less clear than here. *See, e.g., United States v. Garvin*, 565 F.2d 519, 521 (8th Cir. 1977) (finding reversible error where defendant "was not allowed to present proof of his truthful responses to similar questions on these and other insurance applications filed during the same period" because it relates to the existence of a criminal purpose to defraud and a scheme to defraud insurance companies by the use of the mails"); *see also United States v. Hayes*, 219 F. App'x 114, 116 (3d Cir. 2007) ("evidence of good acts is also admissible for a proper purpose such as motive, intent, absence of mistake, etc.").

The government's attempt to exclude evidence of Sierra's course of dealing on EMCOR jobs for the Postal Service should be roundly rejected.[6]

---

[6] Regarding the government's fourth motion, concerning testimony by Mr. Fink, the Court's ruling on the job files establishes without prejudice that they will be admissible. We reserve the right to seek to exclude specific job files

10

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: September 29, 2021 | */s/ Martin S. Himeles, Jr.* |
|  | Martin S. Himeles, Jr. (Bar No. 03430) |
|  | Alicia L. Shelton (Bar No. 11538) |
|  | ZUCKERMAN SPAEDER LLP |
|  | 100 East Pratt Street – Suite 2440 |
|  | Baltimore, MD 21202 |
|  | Tel No: 410-332-0444 |
|  | Fax No: 410-659-0436 |
|  | mhimeles@zuckerman.com |
|  | ashelton@zuckerman.com |
|  |  |
|  | *Counsel for Defendant Joseph Liberto* |

---

after Agent Baer testifies, but do not object to other witnesses testifying first and to the admission of the job files subject to later being struck if the evidence persuades the Court that any of them are inadmissible.

## CERTIFICATE OF SERVICE

I certify that on September 29, 2021, I caused copies of the foregoing Defendant's Reply Memorandum Concerning Legal Principles Governing Admissibility of Job File Exhibits to be served via the CM/ECF system on:

>Jefferson M. Gray
>Matthew Phelps
>Assistant United States Attorneys
>Office of the U.S. Attorney
>36 S. Charles Street – 4th Floor
>Baltimore, MD 21201
>
>Jefferson.M.Gray@usdoj.gov
>Matthew.Phelps@usdoj.gov

>*/s/ Martin S. Himeles, Jr.*
>Martin S. Himeles, Jr.

7793263.1