# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. RDB-19-0600 |
| | ) | |
| JOSEPH EDWARD LIBERTO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## THE GOVERNMENT'S SENTENCING MEMORANDUM

EREK L. BARRON
UNITED STATES ATTORNEY

Jefferson M. Gray
Matthew P. Phelps
Assistant U.S. Attorneys

U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4800
Jefferson.M.Gray@usdoj.gov
Matthew.Phelps@usdoj.gov

*Counsel for the United States*

Date:  May 26, 2022

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

FACTUAL ANALYSIS AND SENTENCING RECOMMENDATION ......................... 5

I.   THE GOVERNMENT'S VIEW OF THE AMOUNT OF THE LOSS
     CAUSED BY DEFENDANT LIBERTO'S CONDUCT IS SUPPORTED
     BY A PREPONDERANCE OF THE EVIDENCE ............................................. 5

     A.   Background:  The Parties' Respective Positions on the
          Amount of the Loss to the Postal Service as Set Forth in
          the Plea Agreement ................................................................. 5

     B.   The Legal Standards Governing the Determination of the
          Amount of the Loss ................................................................. 8

     C.   The Government's Trial Exhibits 33(a) and 36 ....................................... 11

     D.   The Government's Sentencing Charts ...................................................... 13

     E.   Selected Witness Testimony at Trial Relevant to the
          Loss Amount Issue ................................................................. 16

          1.   Kevin Fink (Sierra Project Manager 2013-18) .................................. 17

          2.   Tammy Acha (Sierra Project Manager 2014-16) .............................. 20

          3.   Jeff Bateman (Lighting Maintenance and Earl Post
               (All Quality HVAC) .............................................................. 22

II.  THE GOVERNMENT'S INITIAL RESPONSE TO THE DEFENDANT'S
     EXPERT'S REPORT  ....................................................................... 23

SENTENCING ANALYSIS ...................................................................... 28

CONCLUSION ................................................................................... 31

The United States of America, by its undersigned counsel, submits this memorandum in aid of sentencing in this case.

## **INTRODUCTION**

The evidence already presented by the government during the three weeks of trial here – as well as that which will be presented to the Court in connection with the defendant's sentencing hearing – demonstrates that this case involves an egregious and long-running procurement fraud scheme carried out by the defendant Joseph Liberto and employees of his co-owned company, Sierra Construction, LLC (Sierra), against the United States Postal Service (USPS) and its contractor Emcor Facilities Service, Inc. (EMCOR).  Testimonial and documentary evidence presented at trial established that the fundamental elements of the scheme were in place as early as April 2013, when the defendant executed the first of a series of three service provider agreements (Government Trial Exhibits [GXs] 1(a), 1(b), and 1(c)) that were the subject of substantial discussion at trial.  The scheme then continued for nearly six full years until it was finally brought to an end by the execution of a search warrant by investigators from the USPS's Office of the Inspector General (USPS-OIG) at Sierra's offices on November 30, 2018.  As this court is well aware, few of the fraud schemes prosecuted in this Court involve periods of comparable longevity.  The defendant's success in evading detection for so many years – during which he and his company was highly regarded and trusted by USPS facilities engineers and EMCOR employees who did not know that Sierra was subcontracting to other businesses all or most of the work on roughly 60% of the jobs it was assigned by EMCOR – is a reflection of the care and skill that the defendant and employees working under his direction put into executing this fraud.

Next, the financial losses suffered by the United States government and, through it, American taxpayers as a result of this scheme were very substantial.  The government's lead investigator, USPS-OIG Special Agent Sean Baer, along with a team of several other agents, conducted a file-by-file review of close to 4,000 EMCOR-assigned Sierra job files from the three years 2016-18, which accounted for the second half of the six-year period covered by the defendant's fraud scheme.  As **Exhibit 1(a)** demonstrates, even if a number of categories of jobs contested by the defense – many of which clearly involved fraudulent conduct – are set to one side,[1] Sierra's fraudulent

---

1   The following categories of items that were previously included in Government's Trial Exhibit 36 were separated out and not listed in **Exhibit 1(a),** and these are included instead in **Government Exhibit 1(d)**:

- self-performed jobs;
- jobs that involved a combination of self-performance and use of a sub-contractor;
- jobs that involved more than two subcontractors;
- jobs where it was unclear, based on Agent Baer's file review, if a subcontractor was used;
- jobs that appeared to involve materials providers, or that involved equipment leases; and
- jobs in which the overcharge by Sierra was either less than 10% of what we contend was the justified charge, or was less than $100 in excess of the justified charge.

As we advised defense counsel in a letter on May 15, the fact that we have separated out these particular categories and have listed them separately in **Exhibit 1(d)** does not mean that we concede that none of these transactions involved criminal conduct.  See **Exhibit 2.**  Rather, this simply demonstrates that even without taking these transactions into account, a loss figure of more than $1.5 million and a restitution figure of $2 million are easily supported by a preponderance of the evidence.

The government submits that there is in fact little doubt that many of the self-performed jobs involved fraud – as was demonstrated by the testimony relating to Counts 21 (the repair of the Thurmont, Maryland scissor lift by Kevin Fink) and Count 24 (the replacement of the weathered sign in Hampton, Virginia) at trial, see GXs 21(a-c) & 24(a-c) – and the putting to one side of any job in which the fraud percentage was less than 10% includes some high-dollar value transactions where Sierra was relatively close to bumping up against the $10,000 maximum limit on EMCOR-assigned jobs –

overcharges for just the second half of the scheme alone total $1,547,559.84 – a figure that is in excess of the $1,500,000 loss threshold under U.S.S.C. § 2B1.1(b)(1)(I) at which sixteen levels are added to the defendant's Guideline totals.[2]

Moreover, even if – notwithstanding the false representations that defendant Liberto made in the Supplier Qualifications section of the April 2013 provider agreement (GX 1(a) – we leave 2013 (in which EMCOR assigned Sierra 1,145 work orders and paid it $2,002,378.86, **Exhibit 3**) completely out of the picture, the evidence at trial demonstrated that defendant Liberto's scheme was in full swing throughout 2014 and 2015. The total amount of payments to Sierra on EMCOR-assigned USPS repair projects in those years totaled $2,616,047 and $3,503,247 respectively – for a total of $6,380.341. If the average fraud percentage (16.64%) found by the file-by-file review of the 1,963 transactions included in Exhibit 1(a) is applied to this total, that yields an additional extrapolated estimate of another $433,717 in fraudulent overcharges for 2014 and $580,807 in 2015, for a combined total of an additional $1,014,524 for those two years. That results in a *conservative* estimate of over $2.5 million in fraud losses caused to the American taxpayer by defendant Liberto's procurement fraud scheme.

---

which, if had been exceeded, would have meant that the assignment had to be withdrawn and reassigned as a JOC matter – but where Sierra (and the defendant) still profited substantially as a result of their fraud. See discussion at pages 15-16 below.

[2]   If the $1,547,559.84 total figure shown in Exhibit 1(a) is divided by 35 – the number of months between January 2016 and the execution of the search warrant on November 30, 2018 – that produces an average figure of $44,215.99 in fraudulent charges *every month* for that period, or an average of over $10,000 in fraud losses to American taxpayers *every week*.

That $2.5 million estimate of the amount of the loss caused by the defendant's fraudulent scheme is conservative because, among other things:

- It does not take into account the fraudulent overcharges committed by Sierra during 2013. Yet the trial testimony of Kevin Fink established that the scheme was in place when he was hired and trained by defendant Liberto in 2013. See discussion at page 17 below. The trial testimony of Tammy Acha likewise established that the scheme was full in place when she was hired in January 2014. See discussion at pages 20-21 below. Moreover, as **Exhibit 3** demonstrates, EMCOR assigned Sierra 1,145 work orders and paid it $2,002,378.86 in 2013.

- Moreover, it is clear from the testimony at trial concerning self-performed transactions like those at issue in Counts 21 and 24 that fraud permeated many of Sierra's self-performed transactions as well, in addition to those that it subcontracted to other companies to perform. The setting aside of these transactions thus not only reduces the amount of identified fraud for the years 2016-18, but it also reduces the fraud percentage (16.64%) used to calculate the extrapolated fraud numbers for 2014 and 2015.

Beyond the substantial loss amount, remarkable duration, organizational skill, and long-term personal duplicity in regular, ongoing dealings with USPS facilities engineers, EMCOR employees, and Sierra's own subcontractors that defendant Liberto's fraud scheme involved, there were other troubling aspects of it as well. The most notable of these is that the scheme implicated many of Sierra's own employees, knowingly or not, in significant and dangerous violations of federal criminal law.[3] And while the PSR points to many respects in which the defendant proved himself a caring

---

[3]   Because the defendant's mother Diane Goldberg appears to have been the only Sierra employee other than the defendant who had even physical access to Sierra's contractual agreements with EMCOR, many of Sierra's employees lacked basic knowledge they would have needed to fully appreciate the character of the defendant's fraudulent scheme. And based upon the testimony that other witnesses gave at trial, it appears that they may have been either too trusting in the defendant, or perhaps deliberately avoided asking obvious questions about some of Sierra's established procedures or unusual things they were asked to do.

and committed son, sibling, and parent, this positive conduct must be balanced against the troubling recognition that his scheme involved the knowing use and potential implication of his mother Diane Goldberg[4] and his younger brother (M.L.)[5] in federal criminal conduct.

The remaining sections of this memorandum explain how the government's sentencing charts support our contention that the amount of the loss for purposes of calculating the Sentencing Guidelines and establishing a restitution amount is substantially in excess of $1.5 million, and that $2 million is therefore a reasonable figure to use for both of these purposes. We conclude by applying the factors mandated by 18 U.S.C. § 3553(a) to the facts of the defendant's case.

## FACTUAL ANALYSIS AND SENTENCING RECOMMENDATION

I. **THE GOVERNMENT'S VIEW OF THE AMOUNT OF THE LOSS CAUSED BY DEFENDANT LIBERTO'S CONDUCT IS SUPPORTED BY A PREPONDERANCE OF THE EVIDENCE**

A. **Background:  The Parties' Respective Positions on the Amount of the Loss to the Postal Service as Set Forth in the Plea Agreement.**

This matter was originally tried by this Court over 15 trial days from October 5 through October 25, 2021. At the end of the trial, following 3 days of deliberations, the

---

4    Diane Goldberg was involved in training Kevin Fink and other employees.

5    The defendant's younger brother M.L. was the project manager on three of the indictment's counts (25, 27, and 31). However, he normally worked on the Job Order Contract (JOC) side of Sierra's business under the direction of Sierra's co-owner David Sutherland, which did not involve criminal activity (as the government conceded at trial), and he appears to have only occasionally been asked to assist with EMCOR-assigned projects. As a result, he would have been even less well-placed than some of Sierra's other employees to fully understand the suspect character of the transactions in which he was asked to assist.

jury was unable to reach a unanimous verdict on any count, although the jury reported that its vote was 10-2 in favor of conviction on 31 of the 32 counts, and 9-3 in favor of conviction on the remaining count.

Following the dismissal of the jury and the setting of a new trial date in March 2021, the parties engaged in plea negotiations that resulted in the entry of a guilty plea on January 21, 2022. By the terms of the plea, the defendant admitted that he was guilty of Count 1 of the indictment, which charged him with Conspiracy to Commit Wire Fraud (18 U.S.C. § 1343) in violation of 18 U.S.C. § 371. ECF # 152 (Plea Agreement) at ¶ 1. Count One charged that commencing "at least in or about April 2013,[6] and continuing thereafter until on or about November 29, 2018,"[7] the defendant carried out a scheme to defraud EMCOR and the USPS by hiding the fact that it was using subcontractors on many of the projects it was assigned by EMCOR; by submitting estimates that substantially overstated the expected cost of the repairs (including both materials costs and labor hours) on assigned projects, whether those were to be carried out by subcontractors or by Sierra's own personnel; and then by submitting invoices for payment that substantially exceeded the specified and limited mark-ups on

---

[6]  April 2013 was the date of a service provider agreement (introduced at trial as GX 1(a)) entered into between Sierra and EMCOR, a USPS contractor that was responsible for assigning repair jobs to Postal facilities that were expected to cost less than $10,000.00, and then reviewing and approving proposals on jobs costing between $500 and $2,000 and receiving and processing invoices received from vendors like Sierra for payment. Preliminary estimates were not required for jobs expected to cost less than $500, and estimates on jobs expected to cost $2,000 were forwarded by EMCOR to USPS facilities engineers for review and approval.

[7]  This was the day before a search executed at Sierra's offices by USPS-OIG investigators on November 30, 2018 resulted in the exposure of the defendant's fraudulent scheme and Sierra's subsequent termination as an approved service provider by both EMCOR and the USPS.

subcontracted work that were allowed under Sierra's successive agreements with EMCOR.

Beyond the defendant's guilty plea to Count One itself, the parties further agreed and stipulated to some, but not all, of the applicable factors set forth in the United States Sentencing Guidelines (U.S.S.G.). The parties agreed that the Base Offense Level for the conspiracy charge, pursuant to U.S.S.G. § 2X1.1(a), was a seven (7); and further agreed that an additional two (2) levels should be added pursuant to U.S.S.G. § 3B1.1 because the offense involved more than one criminally responsible participant. ECF # 152, ¶s 1(a) and 1(b).

However, the parties did not agree on the overall amount of the loss that resulted from the defendant's fraud scheme under U.S.S.G. § 2B1.1. The defendant was only willing to stipulate that the amount of the loss was at least $40,000.00, but less than $95,000.00, resulting in an additional enhancement of six (6) levels for the amount of the loss pursuant to U.S.S.G. § 2B1.1(b)(1)(E) and an overall adjusted offense level of fifteen (15) before any reductions. *Id.*, ¶ 1(c). The government's position was that the amount of the loss was more than $1.5 million, but "was not clearly in excess of $3.5 million," therefore resulting in an additional enhancement of sixteen (16) levels pursuant to U.S.S.G. § 2B1.1(b)(1)(I) and an overall adjusted offense level of twenty-five (25) before any reductions. The plea agreement contemplated that the defendant could ultimately receive a two (2) level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. *Id.*, ¶ 1(e). The defendant further reserved the right to seek additional reductions through downward departures or variances. *Id.* at ¶ 1(f).[8]

---

[8]    Although even the defendant had conceded, as part of the plea agreement, that the amount of the fraud loss was between $40,000.00 and $95,000.00, the United States

Thus, leaving aside for the moment whether any downward departures or variances argued for by the defense are determined to be applicable or appropriate here, the question for the Court is whether the defendant's adjusted Guideline Offense level should be a 13 (12-18 months & Zone C), as the defense submitted when the plea agreement was concluded; a level 23 (46-57 months & Zone D), as the government submits; or a figure in between these two levels.

### B.   The Legal Standards Governing the Determination of the Amount of the Loss.

Commentary Note 3(c) ("Estimation of Loss") to U.S.S.G. § 2B1.1 emphasizes that "The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and *estimate* the loss based upon that evidence." (Emphasis added.) That note goes on to state that "The estimate of the loss shall be based upon available information, . . . as appropriate and practicable," including such "general factors . . . as the scope and duration of the offense . . . ." *Id.*, Note 3(C)(vi); *see also id.*, 3(C)(iv) (court may consider "the *approximate* number of victims multiplied by the *average* loss to each victim") (emphasis added). Accordingly, the Fourth Circuit has repeatedly stressed that the sentencing court need only make a "reasonable estimate of loss based on the available information in the record." *United*

---

Probation Office (USPO) subsequently took the view in the Pre-Sentence Report (PSR) that it could only rely on the facts included in the parties' Joint Statement of Facts in calculating the amount of the fraud loss and the guideline enhancement resulting therefrom. Since the Statement of Facts only discussed two specific examples of the fraudulent conduct that the defendant was acknowledging (those charged in Counts 13 and 17 of the indictment), the USPO took the position that it could not find on the basis of the plea agreement standing alone that the loss was in excess of the minimum level of $6,500 provided in U.S.S.G. § 2B1.1(b)(1)(A). PSR, ¶s 35 & 36. The Report noted, however, that there was a dispute between the parties concerning the loss amount, which would be resolved by the Court at sentencing.

*States v. Catone*, 769 F.3d 866, 876 (4th Cir. 2014); *see also United States v. Stone*, 866 F.3d 219, 228 (4th Cir. 2017); *United States v. Pierce*, 409 F.3d 228, 234 (4th Cir. 2005); *United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003).

Moreover, under the Guidelines' Relevant Conduct provision, the specific offense characteristics applicable under any individual guideline must be determined based upon "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," U.S.S.G. § 1B1.3(a)(1)(A) – a provision that is clearly relevant and expansive in its coverage as to defendant Liberto, given the role he originally played in training Kevin Fink and other Sierra personnel. Likewise, because defendant Liberto has pled guilty to a conspiracy charge, the applicable Guidelines in his case must be determined with reference to "all acts and omissions of others" that were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

A district court's estimate of the amount of the loss that was grounded upon a combination of known, identified losses and estimated losses based upon extrapolation from the known losses was approved by the Fourth Circuit in *Pierce*. In that case, which involved charges of conspiracy and mail fraud committed in connection with a bingo operation, a government agent testified to the amount of the loss at trial, which he calculated by "comput[ing] the average monthly purchases of off-the-books bingo games during the period from June 2001 through February 2002 – the period for which records were available – and [then] applied that average to each month going back to September 1999" – a period of nearly two years for which records were *not* available. 409 F.3d at 234. The Fourth Circuit found that this was a perfectly appropriate

procedure to use in generating a "reasonable estimate" of the amount of the loss, explaining:

> Agent Erwin's extrapolation was based on [defendant's employee] Angela Bowery's testimony that the conspiracy maintained the same level of purchasing activity throughout the duration of the conspiracy. To be sure, Bowery testified that she could only estimate the number of purchases made before she began keeping records. Nevertheless, the district court was only required to make a *reasonable estimate* of the loss, and we cannot say that its finding, based on Agent Erwin's calculations and Bowery's testimony, was clearly erroneous.

*Id.* (emphasis in the original).

In this case, Agent Baer and several other agents (whose work he extensively spot-checked) personally reviewed 2,612 job files for repair projects assigned to Sierra by EMCOR for the period from January 1, 2016 – November 29, 2018 for which the information was then summarized in GX 36. While the Court ultimately declined to admit that exhibit at trial, ruling without allowing the government to conduct a redirect examination of Agent Baer, it did so in significant part because Agent Baer testified that he had only reviewed about half of the files himself, while other agents had done the remainder. ECF # 144 (Trial Trans. 10/19/21 PM at 92). However, contrary to what defense counsel argued at trial, the federal courts routinely admit summaries under FED. R. EVID. 1006 where the testifying witness did not personally review all the underlying data, but instead supervised a team of others who did so. *See, e.g., United States v. Fahnbulleh*, 752 F.3d 470, 478-79 (D.C. Cir. 2014) (holding that a supervisor's testimony was enough to admit a summary chart, regardless of whether they directly participated in its production; "he testified that he supervised a team of auditors who reviewed the raw data and prepared the summary, and that he then reviewed the summary"); *United States v. Bray*, 139 F.3d 1104 (6th Cir. 1998) ("to lay a proper

foundation for a summary, the proponent should present the testimony of the witness who supervised its preparation"); *United States v. DeBoer*, 966 F.2d 1066, 1069 (6th Cir. 1992) (approving the admission under Rule 1006 of evidentiary summaries prepared under the direction of the testifying DEA agent); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985) (approving the admission at trial of a summary of costs that the defendant presented because the plaintiffs "had ample opportunity to cross-examine MGM Grand's Vice-President of Finance, under whose direction the summary was prepared"); *United States v. Lemire*, 720 F.2d 1327, 1346, 1349 (D.C. Cir. 1983); *United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979) (agent was suited to attest to authenticity and accuracy of summary chart because he supervised its compilation).  In any case, the government at this point in these proceedings has simply used GX 36 as a starting point.  As the government's sentencing chart 1(a) demonstrates, even if a number of categories of jobs as to which the defense sought raise to issues during its cross-examination of Agent Baer at trial are altogether put to one side (even though the trial testimony clearly demonstrated that many of Sierra's self-performed jobs, in particular, were infected by the same practices of inflating labor time and materials costs that characterized the subcontracted jobs), the result is a "reasonable estimate" of a figure for the amount of the fraud loss in this case that is well in excess of the $1.5 million threshold set forth in U.S.S.G. § 2B1.1(b)(1)(I).

### C.      The Government's Trial Exhibits 33(a) & 36.

At trial, the Court stated that it found Government Exhibit 33(a) – which summarized the facts relating to the government's estimate of the fraud loss for each of the substantive wire fraud charges set forth in Counts 2-32 – to be quite a helpful

summary, and indeed, specifically commended it to the jury's attention. Accordingly, for the Court's reference, we have attached GX 33(a) as **Exhibit 4** to this memorandum.

As for GX 36, that exhibit consisted of 2,612 transactions. In originally preparing GX 36, the government's view was that we should provide the jury and the Court at trial with the available facts on *all* of the Sierra job files for the years 2016-18 that were reviewed by Agent Baer and his colleagues that contained sufficient information to determine if there had been some amount of overcharge, even if it was relatively small. Since the defense focused much of its attack on GX 36 at trial on these small-loss transactions, in order to assist the Court's efforts at reaching a "reasonable estimate" of the amount of the loss here for purposes of calculating the defendant's Sentencing Guidelines level and restitution amount, Agent Baer has taken GX 36 and separated out the other categories identified below:

- self-performed jobs;
- jobs that involved a combination of self-performance and use of a sub-contractor;
- jobs that involved more than two subcontractors;
- jobs where it was unclear, based on Agent Baer's file review, if a subcontractor was used;
- jobs that appeared to involve materials providers, or that involved equipment leases; and
- jobs in which the overcharge by Sierra was either less than 10% of what we contend was the justified charge, or was less than $100 in excess of the justified charge.

As we demonstrate in the next section, even if these categories of transactions originally included in GX 36 are all put to one side, the evidence relating to the remaining transactions is more than sufficient to support the government's fraud loss and restitution order numbers.

## D.    The Government's Sentencing Charts.

**Government Sentencing Exhibit 1(a)** lists 1,963 of the 2,612 transactions that were originally included in the GX 36 that do not fall into any of the categories identified above.  It demonstrates that, in the Government's view, even if the remaining transactions from GX 36 that we have now gathered together in Exhibit 1(d) are not taken into account, the amount of the fraud loss caused by the defendant's conduct just for the years 2016-2018 (for which a file-by-file review was conducted) still totals $1,547,559.84.  And that is without taking into account our extrapolated estimates of an additional fraud amount of $1,018,250.52 for the years 2014-15, as shown in **Government's Sentencing Exhibit 1(e).**

Thus, **Sentencing Exhibit 1(a)** consists purely of the universe of Sierra job files for the years 2016-18 originally included in Government Trial Exhibit 36 that:

- were not self-performed, but involved the use of undisclosed subcontractors;

- appear to have been fully performed by the subcontractor, at least based upon the absence of any clear indicia of work by Sierra employees in the job file or any reference to the job file number in Defendant's Trial Exhibit 205, the daily roster (for October 2016 – November 2019) of the scheduled work assignments of Sierra's field employees;

- did not involve work by more than two subcontractors;

- did not involve any ambiguity as to whether a subcontractor was used;

- did not involve materials providers, or valid equipment leases; or

- involved transactions in which the amount of the identified fraudulent overcharge was more than 10% of the amount of the justified charge, or was more than $100 in excess of the justified charge.

13

Next, in **Government Sentencing Exhibit 1(b)**, we have extracted from the transactions included in **Exhibit 1(a)** all of those that involved Sierra's use as subcontractors of All Quality HVAC (Earl Post) or Lighting Maintenance (Jeff Bateman), both of whose principals testified as government witnesses at trial and were subject to full cross-examination. As summarized at pages 22-23 below, both Post and Bateman testified that on all of the jobs they were hired to do by Sierra, they had no knowledge of any work being done by a Sierra employee. All Quality HVAC was one of the subcontractors most heavily used by Sierra, as reflected by the fact that 320 of the 2,612 Sierra job files from 2016-18 included in Government Trial Exhibit 36 involved work done by All Quality – almost exactly one-eighth of the total. The remaining 23 jobs (lines 321-343) in **Exhibit 1(b)** were all performed by Lighting Maintenance (and, as with the All Quality jobs, none of these jobs were reflected in any way in Defense Exhibit 205). Together, the fraudulent overcharges by Sierra associated with these two contractors standing alone, for the years 2016-18 only, total **$274,090.96** – an amount that, even standing alone, would support an enhancement of **twelve** Guideline levels for the amount of the loss under U.S.S.C. § 2B1.1(b)(1)(G).

Next, the Court has previously made known to counsel its view of the character of the transactions involving the fraudulent Bob's Bucket Truck and Cox Rental receipts, and defendant himself addressed his culpability with regard to these transactions in the Acceptance of Responsibility Statement that he submitted to the Probation Officer. Accordingly, in **Government Sentencing Exhibit 1(c)**, we have listed all of the transactions for the years 2016-18 only which we have identified that involved the use of fraudulent rental receipts from fake companies. As **Exhibit 1(c)** demonstrates, these

14

75 transactions for these three years alone involve calculated fraud losses of $99,966.42.[9]

**Government's Sentencing Exhibit 1(d)** consists of 649 transactions, with calculated fraud amounts totaling $432,510.63, that were originally included in Government Trial Exhibit 36, but which involved one of the circumstances listed at page 12 above. If a job file number was referred to in Defendant's Trial Exhibit 205, the daily roster of expected work assignments for Sierra's field employees, it is highlighted in green. Otherwise, the reasons for separating out these transactions should be clear from the exhibit – i.e., they involved overcharges of less than 10% or $100; they involved more than two subcontractors; they were jobs solely self-performed by Sierra; or they involved equipment leases or purchases of materials, and thus involved circumstances distinct from the fraud involved in Sierra's use of subcontractors or in many of its self-performed jobs. Because of these limitations, note that **Exhibit 1(d)** includes 17 All Quality HVAC jobs that did not involve other subcontractors or a reference in Defendant's Exhibit 205, but in which the calculated fraudulent overcharge was less than $100 or 10%. Notably, in a number of these jobs, the lesser percentage of fraud can be accounted for by the fact that any greater overcharge would have broken the $500 limit below which jobs required no submission of a cost estimate, or the $10,000 limit above which the transaction would have had to be treated as a Job Order Contract (JOC) job. See, e.g, the jobs listed in Lines 18 and 20 (in each case, the subcontractor's invoice

---

[9]    We note that there is some degree of overlap between the transactions listed in **Exhibit 1(b)** and the 75 jobs that are shown in **Exhibit 1(c)**, since the latter includes five All Quality HVAC transactions (with fraudulent overcharges totaling $4,427.65) and 23 Lighting Maintenance transactions (with fraudulent overcharges totaling $32,390.28).

was $375; the justified charge was $424;  and Sierra charged $468, resulting in an

overcharge of $43 or 10.1%); Line 21 (the subcontractor's invoice was $250; the justified

charge was $300; and Sierra charged $376, resulting in an overcharge of $76 but

25.3%); Line 24 (the subcontractor's invoice was $360; the justified charge was $410;

and Sierra charged $498.36, resulting in an overcharge of $88.36 but 21.6%); Line 26

(the subcontractor's invoice was $375; the justified charge was $425; and Sierra charged

$493, resulting in an overcharge of $68 or 16%); Line 29 (the subcontractor's invoice

was $8,261.50; the justified charge was $9,087.65; and Sierra charged $9,567.20,

resulting in an overcharge of $479.55, which, while not insubstantial, in this case was

only 5.3% of the justified amount); Line 32 (the subcontractor's invoice was $187.50;

the justified charge was $237.50; and Sierra charged $324, resulting in an overcharge of

$86.50 [less than $100] but an overcharge percentage of 36.4%); and Line 34 (the

subcontractor's invoice was $375; the justified charge was $425; and Sierra charged

$486, resulting in an overcharge of $61 and 14.4%).

Finally, **Government's Sentencing Exhibit 1(e)** is a summary chart

showing the total fraud amount and resulting fraud percentage for the years

2014-18 based first on the years 2016-18, for which actual file reviews were done,

and then showing the calculated fraud amounts for 2014 and 2015 as well, based

on the known EMCOR payments amounts for those years as shown in

**Sentencing Exhibit 2**.

### E.      Selected Witness Testimony at Trial Relevant to the Loss Amount Issue.

The Court heard the testimony of the witnesses at trial and thus has its own notes

as well as the filed transcripts on the case docket of many of the witnesses  available for

its review.  To assist the Court, however, we wish to provide short statements of the trial

testimony given by Kevin Fink, Tammy Acha, Earl Post, and Jeff Bateman.  (We cite to

the docket entry number where the transcript has been filed on ECF.)

### 1.  Kevin Fink (Sierra Project Manager 2013-18)

Kevin Fink was the most senior and longest-lasting Project Manager who worked

for Sierra and Liberto.  Fink joined Sierra in 2013 and testified at trial that he learned

his job by "shadow[ing] Joe [Liberto] and Diane [Goldberg, the defendant's mother and

another Sierra employee] for the most part." ECF # 132 (Fink Transcript [Trans.]. at 38-

39).  Fink stated that the defendant and Ms. Goldberg taught him to instruct

subcontractors to avoid contact with the Postal Service so that the Postal Service would

not learn that Sierra was using a subcontractor.  ECF # 132 (Fink Trans. at 39-40) ("Q.

Were there any other reasons?  A. Yes, 'cause it might disclose the use of a

subcontractor to the Postal Service.  Q.  And who told you about that?  Who gave you

those instructions?  A.  Joe.").[10]

Fink also testified that he concealed Sierra's use of subcontractors by whiting-out

any reference to a subcontractor that might be on a document submitted to EMCOR or

the Postal Service.  He stated:

> Q.  Sometimes when you had signed certificates of completion that were
> faxed back to you by the subcontractor, would they contain a fax line
> revealing that they came from a subcontractor?
>
> A.  Yes.
>
> Q.  What would you do in those cases?

---

[10]  Project Manager Mike Wineke (2016-2018) likewise testified that he was trained by
"Mr. Liberto, Kevin Fink, Ms. Diane [Goldberg]."  ECF # 138 (Wineke Trans. at 96-97).

A.    It would be whited out or cut out.

Q.    And why would it be whited out or cut out?

A.    It would conceal the fact that a subcontractor was used by Sierra Construction.

ECF # 132 (Fink Trans. at 110).  As the Court may recall, examples of such whited-out transactions were introduced as Government Exhibits 6, 18, and 29 at trial.

Fink also testified about the instructions defendant Liberto gave him concerning how he should go about inflating a subcontractor's charges.  He explained: "A subcontractor invoice of 500 to a thousand, maybe $1,500 would be a 500-dollar markup.  Approaching the 2,000-dollar mark from the subcontractor would be a thousand dollar plus markup."  ECF # 132 (Fink Trans. at 40).

Fink also testified that Liberto taught him to use dummy rental invoices from non-existent companies in order to overcharge EMCOR and the USPS for equipment (typically lift trucks) that Sierra never actually rented:

Q.    And then the next item that we have in this file, it's something says "Bob's Bucket Truck." Tell us about that, please.  It appears to be an invoice.

A.    This is a fake copy of a lift receipt as if it were rented.

* * *

Q.    Is this a real company, Bob's Bucket Truck? Does it exist?

A.    No.

Q.    Tell us about Bob's Bucket Truck and why Sierra Construction submitted an invoice from a non-existent company to EMCOR along with this file -- along with the submission?

A.    It was a way to submit for more money.

Q.    More money than Sierra had actually incurred or paid?

18

A.      Right.

Q.      All right. How did you learn about using Bob's Bucket Truck invoices? Who gave you training or guidance or instruction on that?

A.      It was a template created by Joe originally, and I would -- I obtained the file either by email or it was saved somewhere in the shared hard drive.

ECF # 132 (Fink Trans. at 65, 69). Fink offered similar testimony regarding the fictitious

"Cox Rentals" invoices:

Q.      All right. Let's move along to -- oh, I've been corrected. Let's go to Page 019467. Mr. Fink, do you recognize what the document shown on stamp Page USA019467 is?

A.      Yes.

Q.      What is it?

A.      It is a dummy invoice for a bucket truck rental.

Q.      And why – what suppose[d] company did this dummy invoice come from?

A.      It states a bucket truck, 30-foot use. Is that -- can you restate the question?

Q.      That's fine. What company supposedly rented this bucket truck to Sierra?

A.      Cox Rentals.

Q.      And what was Cox Rentals again?

A.      They were – well, they didn't exist.

Q.      All right. And so why was a bucket truck rental receipt from a company that didn't exist included in the papers related to this transaction?

A.      Because in order to submit an invoice which charged for a bucket truck rental, there must have been – there had to be a receipt included in the invoice submitted to EMCOR.

ECF # 132 (Fink Trans. at 144-45).

After several hours of defense counsel's lengthy cross-examination, Fink corrected defense counsel and acknowledged that he and Joe Liberto deceived the Postal Service:

> Q.   Mr. Fink, you never told at any time during your employment with Sierra, pardon me, you never told Mr. Liberto or anyone else that you thought what was going on was fraudulent, did you?
>
> A.   I -- there have been conversations, yes. I didn't use those words.
>
> Q.   You didn't tell -- you didn't think it was fraudulent, did you?
>
> MR. GRAY:  Objection.  Asked and answered.
>
> THE COURT:  Overruled.  Overruled.
>
> THE WITNESS:  I thought it was deceiving.

ECF # 132 (Trans. at 421-22).

### 2.   **Tammy Acha (Sierra Project Manager 2014-16)**

Tammy Acha was a project manager for Sierra from January 2014 to April 2016. ECF # 162 (Trans. at 4).  Following on Kevin Fink's testimony, she further confirmed two key aspects of defendant Liberto's fraudulent scheme:  (1) it was a routine practice at Sierra to hide its use of subcontractors from EMCOR and the USPS; and (2) defendant Liberto's and Fink's mark-ups over and above the amounts actually charged by Sierra's contractors were arbitrary and had no apparent reasonable or legitimate explanation.  Significantly, it appeared from her testimony that defendant Liberto was far from forthright with Acha about what he was doing, always reserving for himself the actual practice of determining the amount of the fraudulent mark-up on the jobs for which she was the project manager, whereas he eventually was willing to delegate this task to Fink and others like Mike Wineke.

Acha explained that Sierra never disclosed its use of subcontractors when it used subcontractors for its core area of Maryland, D.C. and Virginia, but always disclosed them when Sierra was assigned a job in states outside of this core area. When asked why Sierra would disclose its use of subcontractors outside of its core area but not within it, Ms. Acha acknowledged, "I don't know."[11] ECF # 162 (Acha Trans. at 11). Ms. Acha also acknowledged that the scope of work listed in the invoices and proposals were misleading:

> Q. According to the invoice, who performed the work?
>
> A. Sierra Construction.
>
> Q. Is that true?
>
> A. No.

ECF # 162 (Acha Trans. at 20; *see also* Acha Trans. at 12, 15, 24, and 26).

Acha stated that she first obtained quotes from subcontractors and then gave them to either defendant Liberto or Fink, who would actually prepare the proposal that Sierra submitted to EMCOR. Liberto's and Fink's final proposals were always higher than the subcontractor's quote. When asked to explain what accounted for these price differentials, Acha repeatedly responded, "I don't know." ECF # 162 (Acha Trans. at 10, 22, 25). When asked how she felt about submitting proposals and invoices in amounts that were much higher than the subcontractor's proposals and invoices, Acha testified that she felt "apprehensive." ECF # 162 (Acha Trans. at 26-27).

---

[11]   According to Fink's trial testimony, the reason that Sierra disclosed subcontractors outside of its core geographic area was because defendant Liberto did not think that Sierra could get away with passing off a subcontractor's work as its own in locations that were outside of the mid-Atlantic area.

### 3.   Jeff Bateman (Lighting Maintenance) and Earl Post (All Quality HVAC)

As noted above and demonstrated in **Sentencing Exhibit 1(b),** Sierra frequently used two companies called Lighting Maintenance (Counts 13, 19, 20, 22) and All Quality HVAC (Count 17) as subcontractors, and the Government called witnesses from both of those companies to testify. Jeff Bateman from Lighting Maintenance flatly confirmed that his technicians performed the work themselves and were not working with or assisted by anyone from Sierra. ECF # 142 (Bateman Trans. at 5) ("We were always performing the work."). Because Lighting Maintenance used its own bucket truck on its jobs, defendant Liberto and his subordinate project managers used Lighting Maintenance jobs to charge the USPS for phony bucket truck expenses from the fake companies "Cox Rentals" and "Bob's Bucket Truck." Bateman confirmed that Lighting Maintenance provided its own bucket truck; that their use of the bucket truck was built into their hourly rate; and that Sierra never provided a bucket truck for Lighting Maintenance to use. ECF # 142 (Bateman Trans. at 5-7).

During his direct examination, Bateman testified about several charged counts that involved Lighting Maintenance jobs. These jobs included Count 13, a lighting job in Gaithersburg, Maryland. There, Sierra's proposal was $1,000 more than Lighting Maintenance's invoice, which was dated two weeks before Sierra submitted its proposal to EMCOR. To achieve that $1,000 increase, Sierra not only included a fake bucket truck receipt, they also inflated the price and quantity of the materials used. ECF # 142 (Bateman Trans. at 9-10). Not surprisingly, Bateman testified that he had never heard of any companies named "Bob's Bucket Truck" or "Cox Rentals." ECF # 142 (Bateman Trans. at 10, 17).

22

Likewise, Earl Post of All Quality HVAC testified that his company "rarely" worked with personnel from Sierra on jobs, and that the jobs on which they did so were the JOC jobs – larger jobs with anticipated costs in excess of $10,000 that were handled outside of the EMCOR framework.  ECF # 142 (Post Trans. at 42).  In his direct examination, Post discussed multiple jobs in which Sierra had hired All Quality to do the required work, including Count 17, in which Sierra submitted a proposal (and later charged) the USPS $1,887 for a job on which All Quality had quoted Sierra a price of $587.50.  ECF # 142 (Post Trans. at 47-48).  On another All Quality job, Sierra increased the cost of a compressor from $3,100 on All Quality's proposal to $3,700.  ECF # 142 (Post Trans. at 48-50).

## II.    THE GOVERNMENT'S INITIAL RESPONSE TO THE DEFENDANT'S EXPERT'S REPORT

The Government has had relatively limited time to date to review the 79-page statement of the opinions of the defendant's expert witness, Richard Potocek, which we received on the afternoon of Friday, May 13th.  We anticipate that we will have additional comments about his opinions in our reply brief, as well as at the sentencing hearing.  We will also be glad to provide appropriate cross-examination of him at the sentencing hearing, if the Court believes that would be helpful.  We can make the following preliminary comments at this time, however.

Although a sentencing is not subject to the evidentiary rules that apply at trial, FED. R. EVID. 1101(d)(3), we question whether Potocek's reported opinions even suffice to meet the standards of helpfulness and reliability that would apply in the trial context. FED. R. EVID. 702 (an expert witness can express an opinion if "the testimony is based on

sufficient facts or data[.]"); *see also Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (noting that "helpfulness to the trier of fact is [the] 'touchstone'" of FED. R. EVID. 702).

Based upon our initial review, Potocek's opinions are unhelpful and lack an adequate factual foundation. In particular, Potocek did not attempt to determine the overall amount of the loss resulting from defendant Liberto's five-plus year fraudulent criminal scheme. Instead, he simply tries to rebut the Government's loss calculation on a handful of counts selected for him by defense counsel, and he ignores the remainder. While the defendant's desire to avoid discussing incriminating facts and well-founded charges is understandable, simply ignoring them does not help the Court determine the loss associated with defendant Liberto's conduct and the proper restitution amount that is owing as a result. Moreover, Potocek does not appear to bring any kind of special expertise to his opinions. His report appears to us to be essentially a summary rehash of defense counsel's various trial witness cross-examinations and jury arguments, which the Court has already heard at length and can take into account without having to hear from his proffered expert.

We further submit that Potocek's proffered opinions are particularly unpersuasive and unreliable because he failed to consider all the evidence, particularly that which runs counter to his stated opinions. Missing from the Potocek report is any evidence that he relied on more than a few snippets of trial testimony. Another glaring omission from his report is any indication that he has read or taken into account the statement of facts supporting defendant Liberto's guilty plea.

For example, Potocek's report repeatedly gives Sierra credit for administrative work performed by its project managers when, given the contractual requirements that Sierra (and defendant Liberto personally) had accepted, Sierra should either (1) never

have hired subcontractors to do the work in the first place or, alternatively, (2) should have disclosed its use of subcontractors and not circumvented the clear and strict limitations that EMCOR's successive service provider agreements imposed on the allowable mark-ups of subcontracted work. Potocek's report also ignores the fact that defendant Liberto blatantly misrepresented Sierra's qualifications and subject-matter expertise, claiming that Sierra was "strong" in professions where Sierra in fact did not employ any licensed specialists. GX 1(c), 1(j)-6.

Stephen Young, a facilities engineer with the Postal Service, testified that he thought that Sierra was self-performing its work: "Q.  Did you think that you could send work to Sierra that they would self-perform in HVAC?  A.  Yes.  Q.  Electrical?  A. Yes. Plumbing?  Yes." ECF # 136 (Young Trans. at 72).  Young added that using subcontractors "adds another layer . . . [and] having to go that extra step just delays the process typically." ECF # 136 (Young Trans. at 71).  The Government introduced an email at trial in which Young assigned a project to Sierra, but when Sierra did not get the work done in a timely manner and Mr. Young found out that Sierra was using a subcontractor, Young wrote to defendant Liberto, "I sent the work order to you, not a subcontractor.  If Mike or Kevin or whoever had this file prior to you would have told us you were using a subcontractor, I could have reassigned [this] hours ago." ECF # 136 (Young Trans. at 5).

When EMCOR assigned a project to Sierra, it – as well as the USPS – expected Sierra to actually perform the work itself, and not to rely on the services of a middleman or a general contractor.  Yet Potocek's report repeatedly gives Sierra credit for administrative time on subcontractor-performed work that, had it been properly disclosed, was subject to strict and expressly defined limitations on subcontractor mark-

25

ups that defendant Liberto had certified his agreement to – while all the while knowing that he intended to completely disregard them.  Moreover, as the evidence at trial demonstrated, Sierra's sloppiness about staying on top of its (undisclosed) subcontractors frequently resulted in substantial delays on getting projects completed.

Potocek also relies on Liberto's trial defense that, as long as Sierra invoiced the USPS for the amount stated on its firm fixed price proposal, it did not cause a loss to the USPS.  This "opinion" fundamentally misunderstands this case.  Liberto and the subordinates acting under his guidance, training and direction as a matter of routine practice substantially, and sometimes wildly, inflated the expected materials costs and labor hours contained in the quotations they had received from the subcontractors they hired and did not disclose.  EMCOR and the USPS expected their service providers to act with integrity – this was foundational to the successive contracts to whose terms defendant Liberto certified his acceptance.  Moreover, many of the USPS facilities engineers, in particular, thought – wrongly – that they could trust the defendant based upon their personal contacts with him.

The inflated proposals that defendant Liberto and his subordinates submitted – in some cases, even after the work was already complete and they knew exactly what Sierra was being or had been charged – are thus classic examples of fraud in the inducement.  That is what the defendant ultimately pled guilty to and what he is being sentenced for.  Yet Potocek's report opines that as long as Liberto and Sierra successfully defrauded EMCOR and the USPS at the proposal stage, then he never overcharged the USPS, never caused a loss, and thus is immunized from criminal or financial responsibility by the very success of his conscious and deliberate deceit.  This isn't that

26

far removed from killing your parents and then asking leniency from the Court because you are now an orphan.

Defendant Liberto has pled guilty to causing Sierra project managers to "increase the number of hours proposed, and the costs and sometimes the numbers and kinds of materials proposed" without any qualification as to whether the proposal was not-to-exceed (NTE) or firm fixed.  ECF # No. 152 (Plea Agreement) at 16.  More generally, the four bullet points outlining Liberto's criminal conduct on page 5 of the Stipulation of Facts to Liberto's guilty plea draw no distinction between these two types of projects. *Id.*  Likewise, Kevin Fink never testified that he only inflated NTE proposals but not FFP proposals.  Tammy Acha never testified that these types of proposals were prepared differently.  Mike Wineke testified that there was no difference to him between the two types of proposals – and he was right.  ECF # 141 (Wineke Trans. at 90) ("My understanding was that firm-fixed and not-to-exceed were the same thing to me.").  One type of proposal said NTE at the top; the other said Firm Fixed; and there was no material difference in how Liberto and his subordinates treated them.  Liberto lied on both types of proposals and instructed his project managers to lie on both types of proposals.  Potocek's report manages to conclude that even though a proposal contained inflated parts and inflated labor and vastly exceeded the contractually-limited mark-ups on subcontracted work, the USPS did not lose money simply because the proposal had "Firm Fixed" written on the top.  For these reasons, among others, Potocek's report and his anticipated testimony will do little to help the Court determine the loss or the appropriate restitution amount associated with Liberto's criminal conduct.

27

## SENTENCING ANALYSIS

The government will have more to say about the defendant's acceptance of responsibility statement and the § 3553(a) factors either in its reply brief or at sentencing, especially since – given that the latter currently remains under seal, pending the Court's ruling on the motion we filed today – we believe that at this time we are significantly constrained in what we are able to say in regard to it. Otherwise, we note the following.

**§ 3553(a)(1) (The Nature and Circumstances of the Offense, and the History and Characteristics of the Defendant).** – As previously indicated, this case involves an extremely substantial, multi-million fraud against a famously cash-strapped government agency upon which every American citizen relies, and indeed upon which the health of our Republic substantially depends. This fraud was not the product of a single bad choice under financial pressures or other exigent circumstances, but instead was deliberately engineered by a defendant who already had a successful business that had rewarded him with a high standard of living. Simply put, the defendant did not like EMCOR's limitations on subcontractor mark-ups, so he simply decided to disregard them and to charge what he pleased, while covering up the fact that he was doing so. The fraud scheme he initiated and orchestrated continued for nearly six years, and it involved literally thousands of separate fraudulent transactions. The fraud continued, consistently, week in and week out, with American taxpayers being regularly defrauded (based upon the government's view of the facts) of an apparent average of roughly $10,000 every week and over $40,000 every month. In addition, as we have noted, the defendant's conduct exposed his employees and even members of his own family to involvement in a long-running and serious criminal scheme to violate

28

federal criminal law.  The nature and circumstances of this offense are therefore quite serious and exceptionally troubling.

Nor was the defendant a young man or an inexperienced businessman at the time he commenced this offense: rather, he was close to 40 years old.  He was (and is) obviously a highly experienced, astute, and successful businessman, whose extensive business interests, holdings and activities require over twenty paragraphs and five full pages of the PSR to detail.  While his counsel asserted at trial that he was "confused" by the terms of the service provider agreements, he was certainly sufficiently well-versed in business matters to have understood the importance and availability of legal counsel, which he and his business could clearly have afforded.  He also could easily have sought more express guidance from EMCOR personnel or the USPS's facilities engineers, with whom he was well-acquainted, and who respected and trusted him and valued what they mistakenly thought were the broad and extensive construction and maintenance competencies of his company.

Even beyond that, however, the evidence and testimony presented by the government at trial demonstrated that this offense was carried out by exceptionally devious means.  This is shown by the time and care the defendant and Sierra employees acting under his instruction and guidance invested in bumping up large numbers of individual material items by small amounts, or the means that were resorted to pull off fraudulent overcharges even in the case of some out-of-area transactions where Sierra's submitted paperwork did disclose its use of a subcontractor.  The few of the defendant's surviving handwritten notations that show him mulling over just how egregiously to overcharge the USPS in particular transactions are chilling.

As against that, the defendant is clearly an intelligent, hard-working, and deeply detail-oriented man (although the latter characteristic is a double-edged sword in this context).  He has maintained a loving relationship with his spouse, who is also a partner in many of his legitimate business ventures, for fully 30 years.  One cannot but be impressed by the accounts in the PSR of his care, support, and commitment to his parents, siblings, children, and other family members.  Again, however, these fine qualities are undercut by the dismaying greed and recklessness that led him to risk everything that he had worked for and built.

**§ 3553(a)(2)(the instrumental purposes of sentencing: reflecting the seriousness of the offense, promoting respect for the law, providing just punishment and adequate deterrence, and specific deterrence and incapacitation).** – Government procurement fraud cases like this one that are committed by company owners and/or top officers are pre-eminently crimes of cold calculation, deep selfishness and arrogance, and a willingness to invest substantial time and care in successfully carrying out a criminal scheme and then keeping it up and running and avoiding detection.  All of those considerations support a substantial sentence, as does the need for adequate deterrence of others who are similarly placed. On the other hand, notwithstanding the length of this criminal scheme, its circumstances – arising as it did out of the defendant's co-ownership of a company, in which he was able to operate without much supervision or monitoring by others – as well as the mark that will be placed upon him once he has a federal criminal felony record should mitigate against the likelihood of similar repeated criminal activity by him in the future.

30

At this time, it appears likely that the above considerations – along with our concerns about a number of aspects of the defendant's Acceptance of Responsibility statement – will in our view support a sentencing recommendation in at least the middle of the Guideline range finally determined to be applicable by the Court. However, we will reserve the government's final specific sentencing recommendation until we have reviewed the defense's sentencing filings, including any letters of support filed in the defendant's behalf, and have heard the Court's resolution of the disputed Guidelines issue of the amount of the loss.

## **CONCLUSION**

For the reasons set forth above, and with the reservation stated immediately above, this Court should find at the sentencing hearing in this case that:

- the amount of the loss to the victim, the United States Postal System, is at least $2 million, therefore resulting in a specific enhancement of **sixteen (16)** levels under U.S.S.C. § 2B1.1(b)(1)(I), and a final adjusted offense level after applying a two-level reduction for acceptance of responsibility of 23, resulting in a Sentencing Guideline Range of 46-57 months; and

- that this Court should enter a restitution order against the defendant pursuant to 18 U.S.C. § 3663A(A)(1) & (c)(1) in the amount of $2,000,000.00.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

/s/

_____

Jefferson M. Gray
Matthew P. Phelps
Assistant U.S. Attorneys

U.S. Attorney's Office
District of Maryland

31

36 S. Charles Street, 4th Floor
Baltimore, MD 21201
(410) 209-4800
Jefferson.M.Gray@usdoj.gov
Matthew.Phelps@usdoj.gov

*Counsel for the United States*

## EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1(a) | Government Fraud Loss Spreadsheet for Sierra Construction for the Years 2016-18, Based Upon Individual File Reviews and Setting Aside Certain Categories of Transactions Shown in Exhibit 1(d) |
| 1(b) | Fraud Losses Associated with Transactions in which Sierra Construction Used Either All Quality HVAC (Earl Post) or Lighting Maintenance (Jeff Bateman) [these transactions are also included in Exhibit 1(a)] |
| 1(c) | Fraud Losses Associated with Transactions in which Fraudulent Bob's Bucket Truck or Cox Rental Receipts were Submitted to EMCOR [these transactions are also included in Exhibit 1(a)] |
| 1(d) | Transactions that Were Included in Government's Trial Exhibit 36 that Are Not Included in Exhibit 1(a) |
| 1(e) | Fraud Percentages for USPS Projects Assigned by EMCOR to Sierra Construction, Based Upon File Review (2016-18) and Extrapolated Numbers (2014-15) |
| 2 | Letter from Government Counsel to Defense Counsel Dated May 15, 2022 Explaining Transactions Included in Exhibit 1(d) |
| 3 | Data sheets generated by EMCOR at the Government's Request Show Payments Received by Sierra Construction on EMCOR-Related Jobs between 2013-2018 |
| 4 | Government's Trial Exhibit 33(a), Showing Key Facts and Calculated Fraud Losses on Each Indictment Count |

33

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/
_____
Jefferson M. Gray